WILLIAM H. CHILDERS, Appellant, v. NAPOLEON B. PICKENPAUGH and CLAUD A. PICKENPAUGH.

(No. 13658.)

Division One, April 13, 1909.

1. FRAUDULENT CONVEYANCE: Money Unaccounted for. The owner of 480 acres of land and ninety-seven cattle and twenty horses, worth $14,000, had employed attorneys in a suit for personal injuries and of his own motion dismissed the suit. They gave him written notice that unless he paid their fees they would sue him at the next term of court. Thereupon, within a week, he conveyed 120 acres of the land to his son, for the expressed consideration of $3,600, the real consideration being the assumption of a mortgage for $2,250, debts due him to the amount of $484, the assumption of $400 debts due others, and the payment of a judgment for $310. Execution had been issued on this last judgment, levy made, and the sale was to take place the next day after the deed was made, and the son borrowed the money to pay it from his grandfather and it was paid. Later the attorneys obtained a judgment for $1,750, and the same day the landowner conveyed another 120 acres worth $3,600 or more, to his father, who lived in another State, and went hurriedly and by an unusual route from the courthouse to his home to deliver the deed, and his father testified that he assumed a mortgage for $2,400 and paid him $600 in money. Another 120 acres he had previously conveyed to a third party, but he does not show how much he obtained for that tract, nor what he did with the money, nor does he attempt to show what he did with the cattle and horses, nor what he did with the $600 he received from his father. He specifically mentions all his debts, and they amounted to $5,600, mortgages and all, and if to that is added $2,000 for his homestead interest, he still had $6,400 worth of property unaccounted for. Held, first, that the evidence is sufficient to show he had conveyed his property with the intention to hinder and defraud his creditors, and especially his attorneys; and, second, the evidence further shows that his son and father both knew of his fraudulent purpose, and participated in it for the purpose of aiding him, and the deeds to them are fraudulent also.

2. ———: Gift to Children: Rents. The gift of rents and other property to a son of legal age by an insolvent debtor is a fraud in law upon his creditors. In this case the insolvent father permitted his son to use and occupy for two years without paying rents 120 acres of land having a rental value of from $420 to $480, and to move one of his houses on to the land after he had attempted to convey the land to the son.

3. ——: ——: ——: **Solvent Debtor.** If the debtor is solvent the gift of rents to a son of legal age is void because a fraudulent disposition of his property, if thereby he is rendered unable to pay his debts.

4. ——: **Altering Deed: Badge of Fraud: Burden of Proof.** Prior to judgment the debtor had attempted to convey the north half of the northeast quarter of a certain section to his son, and the scrivener described it as "W 1-2 N. E.," and the recorder so recorded it. Thereafter judgment was obtained by plaintiff, and execution was levied on the north half of the northeast quarter. Shortly after the judgment was rendered, the son, without consulting his father, took the deed to the scrivener, who, at his request, erased the letter "W" and wrote in the word "North," and both he and the son testified that the letter in the original deed was an "N" and not a "W," and that "it was as plain as the nose on a man's face." The recorder testified that the letter was a "W," and that he recorded it correctly. *Held, first,* that the presumption is that the recorder did his duty and registered the deed correctly; *second,* the deed having been altered and therefore was not of itself any evidence that the original letter was an "N" and not a "W," and the alteration itself being a badge of fraud, and litigation having arisen as to whether the judgment or deed was a prior lien on one forty of the land at the very time the alteration was made, the evidence should be cogent and convincing and beyond reasonable doubt that the letter in the original deed was an "N" and not a "W."

Appeal from Putnam Circuit Court.—*Hon. Geo. W. Wanamaker,* Judge.

REVERSED AND REMANDED (*with directions*).

*E. M. Harber, A. G. Knight* and *N. A. Franklin* for appellant.

(1) The court erred in finding for the defendants and rendering judgment against the plaintiff on the first count of his petition. (a) Every conveyance of land made to hinder or delay creditors in the collection of their lawful demands shall be deemed void. R. S. 1899, sec. 3398; State ex rel. v. Purcell, 131 Mo. 312; Martin v. Estes, 132 Mo. 402; Imhoff v. McArthur, 146 Mo. 571. (b) At the time of contracting the

debt for which judgment was obtained, execution issued, levy and sale made, respondent N. B. Pickenpaugh owned 485 acres of land, 90 head of cattle, and other personal property. This property had all been sold and conveyed when the execution was levied except the homestead and such other property as was exempt. These facts tend to show fraud. Boyd v. Jones, 60 Mo. 454; Bank v. Buck, 123 Mo. 141; Grocery Co. v. May, 78 Mo. App. 323. (c) A participation by the purchaser in the fraudulent intent of his grantor defeats his title as against his grantor's creditors. Johnson v. Sullivan, 23 Mo. 474; Burgert v. Barchert, 59 Mo. 80; Stone v. Spencer, 77 Mo. 356; Sexton v. Andrews, 95 Mo. 373; Garesche v. McDonald, 103 Mo. 1; Earl v. Hart, 14 Mo. App. 594; Deering v. Collins, 38 Mo. App. 73; Frankenthal v. Goldstine, 44 Mo. App. 189; Pierson v. Slifer, 52 Mo. App. 273; Baker & Taylor Co. v. Schneider, 85 Mo. App. 412; Chapel, Ecker & Dowley v. Clapp, 29 Ia. 191; Zeiver v. Lyons, 44 Ia. 510; Jones v. Heatherington, 45 Ia. 681. (d) A creditor who attacks a conveyance from his debtor to a vendee on the ground that the conveyance was made to defraud creditors, is not required to show by direct and positive evidence that the vendee knew the purpose of his vendor was to defraud his creditors, but the vendee's knowledge of such purpose on the part of his vendor may be inferred from the circumstances attending the transaction. Van Raalte v. Harrington, 101 Mo. 602; State ex rel. v. Mason, 112 Mo. 374; Ins. Co. v. Smith, 117 Mo. 261; Kurtz v. Troll, 175 Mo. 506; Chapel, Ecker & Dowley v. Clapp, 29 Ia. 191; Zeiver v. Lyons, 40 Ia. 510; Zimmerman v. Henrichs, 43 Ia. 260; Jones v. Heatherington, 45 Ia. 681. (e) Respondent C. A. Pickenpaugh took and accepted the deed to this land from his father, knowing at the very time that his father's creditors were demanding the payment of their claims. In order to sustain and uphold his title under these conditions, three

things must concur: 1st, he must have bought the land without notice of the bad intent on the part of his father; 2d, he must have purchased from his father for a valuable consideration; and, 3d, he must have paid the purchase price before he had notice of the fraud. Arnholt v. Hartwig, 73 Mo. 485; Dougherty v. Cooper, 77 Mo. 528; Sexton v. Anderson, 95 Mo. 373; Check v. Waldron, 39 Mo. App. 21; Dixon v. Hill, 5 Mich. 408. (f) Even though respondent C. A. Pickenpaugh gave, and respondent N. B. Pickenpaugh accepted, a valuable and sufficient consideration for the land described in plaintiff's petition, yet such sufficient and valuable consideration will not support the sale or uphold the deed if there was any design on the part of the vendor and vendee to hinder or delay the vendor's creditors in the collection of their debts. Burgert v. Barchert, 59 Mo. 80; Snell v. Harrison, 104 Mo. 158; White v. Gibson, 113 Mo. App. 568; Kansas Moline Plow Co. v. Sherman, 3 Okla. 204. (2) The court erred in finding for defendants, and in rendering judgment against plaintiff on the second count of his petition. (a) The lien of a judgment takes precedence over an unrecorded deed, and since at the time of the rendition of the judgment in favor of Harber & Knight et al. vs. N. B. Pickenpaugh, April 26, 1904, respondent N. B. Pickenpaugh was the record owner of the northeast fourth of the northeast quarter of section 7, the purchaser at the sheriff's sale under the execution acquired the legal title thereto; and no change or alteration of the deed of August 28, 1903, by placing this forty acres of land in it could work injury or defeat the purchasers' title. Hence, the finding and judgment for defendants on the second count of plaintiff's petition was clearly erroneous. R. S. 1899, sec. 3713; Jones v. Luck, 7 Mo. 551; Hill v. Paul, 8 Mo. 479; Reed v. Austin, 9 Mo. 722; Frathingham v.

Stacker, 11 Mo. 77; Cravens v. Rossiter, 116 Mo. 344. (b) If the recorder made a mistake in recording the deed of August 28, 1903, recording it the west half, when in fact it was the north half, such mistake could not affect the title of the purchaser at the execution sale, since the obligation of giving notice rests upon the party holding the title and if his duty is imperfectly performed he must suffer the consequence of his neglect, and not an innocent purchaser. Terrell v. Andrew County, 44 Mo. 309; Bishop v. Schneider, 46 Mo. 472; Troyer v. Wood, 96 Mo. 479; Bank v. Carrondalet Real Estate Co., 150 Mo. 570; Williams v. Butterfield, 182 Mo. 185; Dawson v. Cross, 88 Mo. App. 298. (c) The sheriff's deed put the paramount legal title to the northeast fourth of the northeast quarter of section 7 in plaintiff, and no evidence of mistake in the recorder recording, or the scrivener in drafting, the deed could overcome its value and effect in sustaining plaintiff's right to recover on the second count of his petition. Buxton v. Carter, 11 Mo. 481; Norfleet v. Russell, 64 Mo. 176; Miller v. Hardin, 64 Mo. 545; Ford v. French, 72 Mo. 250; Dunlap v. Henry, 76 Mo. 106; Snuffer v. Howerton, 124 Mo. 637; Stephens v. Murray, 132 Mo. 468; Sells v. McAnow, 138 Mo. 267; Burnham Heirs v. Hitt, 143 Mo. 414. (3) It being admitted as a fact, both in the separate answer of respondent C. A. Pickenpaugh, and by admission of his counsel that the deed from N. B. Pickenpaugh to C. A. Pickenpaugh, August 28, 1903, was misrecorded, no question as to plaintiff's title to the northeast fourth of the northeast quarter of section 7 was in issue, and all evidence as to mistake in the description should have been excluded. Hutchins v. Railroad, 97 Mo. App. 548.

*B. L. Robinson, Lorenzo Jones* and *Higbee &
Mills* for respondent.

(1)   The deed from N. B. Pickenpaugh to Claud
Pickenpaugh conveyed the tracts intended to be con-
veyed, and the subsequent writing of the word
"North" in the deed in lieu of the letter "N" in
the description, or even a destruction of the deed it-
self, would not have affected the title already vested
in the grantee.   Alexander v. Hickox, 34 Mo. 500;
Potter v. Adams, 125 Mo. 124.   (2) The deed was re-
filed and recorded August 17, 1905.   The sheriff's
sale, under which plaintiff claims title, occurred on
September 6, 1905.   At this sale Claud Pickenpaugh
gave public notice that he was the owner of the land.
The filing of the deed August 17, 1905, imparted no-
tice to the world, and plaintiff took no title as against
Claud Pickenpaugh's deed, which was made prior to
the judgment and clearly recorded prior to the sale.
Black v. Long, 60 Mo. 181; Hope v. Blair, 105 Mo. 95.
The court could not have found otherwise than it
did upon this issue, but even conceding appellant's
contention that the land was misdescribed in the deed,
Claud Pickenpaugh's equitable title will prevail, plain-
tiff having had both actual and constructive notice of
his purchase and of the conveyance of the land to him.
Parks v. Bank, 97 Mo. 130.   If it were a "W" instead
of an "N," the subsequent change to "North" with
the approval of all parties to the deed so as to con-
form to the original intent of the parties was simply
what any court would have compelled the grantor to
have done; at most it was the execution of a new deed;
it requires no new acknowledgment as an unacknowl-
edged deed of a party *sui juris* passes title.   Claud
Pickenpaugh's open possession was notice to the world
of his claim of ownership.   Westminster College v.
Peirsol, 161 Mo. 287; Davis v. Briscoe, 81 Mo. 36;
Leavitt v. La Force, 71 Mo. 353; Seiberling v. Tipton,

113 Mo. 381. (3) Appellant has wholly failed to prove that N. B. Pickenpaugh owed him and his associates a dollar at the time of the sale to his son in question. The judgment is proof that N. B. Pickenpaugh owed them at the day of the judgment, but in a case of this character it does not establish a prior indebtedness, where the judgment creditor seeks to reach property which was conveyed prior to the entry of the judgment. Schmitt v. Dahl, 88 Minn. 506. (4) The record is utterly barren of proof of any fraud and collusion between defendants. Plaintiff cannot recover upon a mere suspicion of fraud. Bank v. Worthington, 145 Mo. 99; Wall v. Beedy, 161 Mo. 640. Nor does the fact that the grantee in this deed was the son of the grantor vary the rule that fraud is never presumed, but must be proved by the party alleging it. Ettinger v. Kahn, 143 Mo. 492; State v. Meysenberg, 171 Mo. 58.

WOODSON, J.—This is a companion suit to the one involved in Appeal No. 13657, now pending in this court, the two cases growing out of a former suit by the law firms of Harber & Knight and Childers Brothers, as plaintiffs, against Napoleon B. Pickenpaugh, one of the respondents in the case at bar, as defendant, in which said Harber & Knight and Childers Brothers, on the 26th day of April, 1904, obtained a judgment for $1,750 against said N. B. Pickenpaugh for attorney's fees for services rendered in a suit by said N. B. Pickenpaugh against the Chicago, Milwaukee & St. Paul Railroad Company for $20,000 damages for personal injuries. That suit was filed in the circuit court of Sullivan county on the 18th day of March, 1902, and at the April term of said court following the Railroad Company appeared and filed its application and bond for a change of forum, and the change was awarded to the United States Circuit Court, Western Division, Western District, at Kansas City, Missouri. After reaching the Federal Court,

the cause was first continued on motion by the railroad company to compel plaintiff therein to file cost bond, and at the next term the cause was again continued, because plaintiff's injuries rendered him unable to appear in court. These continuances in the Federal Court carried the case over until the April term, 1903, of that court, it being at that term set for hearing on May 12th. Sometime the last of April, or the first of May that year, the plaintiff in that suit without the knowledge or consent of his attorneys entered into some sort of an agreement, the nature of which is not shown, with the railroad company, by which he agreed to and did dismiss it when it was called for trial; plaintiffs claiming he compromised and settled the case against the railroad company for a large sum of money, and in consequence thereof agreed to dismiss the suit, while upon the other hand N. B. Pickenpaugh, the plaintiff in that suit, testified that he never received a cent in compromise of the case, but that he voluntarily dismissed the same.

When plaintiffs in this suit learned of the agreement of compromise or dismissal, they requested a settlement and payment to them of their proportionate part of the amount received from the railroad company on compromise, as per his contract with them, but he refused to pay them one cent, and defiantly told them if they could get anything off of him "they were welcome to it." After this interview a number of letters were addressed to him requesting settlement, the last one on August 23d, and is as follows:

"Milan, Mo., Aug. 23d, 1903.
"N. B. Pickenpaugh, Esq.,
    "Lucerne, Missouri.
    "Dear Sir: We have repeatedly, on behalf of Harber & Knight and ourselves, written you requesting that you take some steps toward a settlement with us for time, services and expenses while caring for

your interests in the case against the Milwaukee Railroad Company. To all these requests you have turned a deaf ear, and each letter you have absolutely ignored.

"Now we beg to say to you frankly and positively that unless you make some satisfactory settlement with us for this fee in the next few days we will submit our claim to the November term of the Putnam County Circuit Court, and abide its judgment as to the amount you should pay. Please give this matter your immediate attention.                         Respectfully,

"CHILDERS BROS."

Plaintiffs failing to receive a reply to this letter, and failing to reach any settlement of their claim for fees due them for services rendered by them in the case of Pickenpaugh against the railroad company, did, on October 22, 1903, bring suit therefor in the circuit court of Putnam county, at the November term, 1903. On application of defendant that case was continued until the April term, 1904. Defendant answered, at that term, and on the 26th day of April, a trial was had, the defendant though present took no part therein, which resulted in a judgment for plaintiffs for the sum of $1,750.

No part of this judgment having been paid, the plaintiffs therein, on the 7th day of August, 1905, caused to be issued out of the office of the clerk of the circuit court of Putnam county, an execution against the defendant therein, and delivered the same to the sheriff, who, on the 9th day of August, 1905, seized and levied on the north half of the northeast quarter of section 7, and the northwest fourth of the northwest quarter of section 8, all in township 65 of range 20, Putnam county, together with other lands, and sold the same to satisfy that judgment. At that sale, under that execution, which occurred September 6, 1905, the plaintiff, and appellant herein, became the purchaser, and received, filed and recorded his sher-

iff's deed. Possession of the land being refused, he brought this action in two counts, the first to set aside a deed dated on the 28th day of August, 1903, by N. B. Pickenpaugh and wife to his son, C. A. Pickenpaugh, on the ground that it was made to defraud creditors, and for the further reason, that, after the issuance, levy and seizure under the execution, the defendant, C. A. Pickenpaugh (one of the respondents herein) has changed, altered, interlined and placed in said deed other lands at that time belonging to the defendant, N. B. Pickenpaugh, to-wit, the northeast one-fourth of the northeast quarter of section 7, township 65, of range 20. The second count of the petition was ejectment.

The evidence tended to prove the following facts on behalf of plaintiffs:

That when N. B. Pickenpaugh employed plaintiff and others to prosecute his suit against the railroad company, he had in his own name four hundred and eighty acres of land, ninety-seven head of cattle, twenty head of horses and mules, a number of sheep and hogs, and some other personal property; all of which was reasonably worth $14,000; and that the lands involved in this suit were a part of the lands above mentioned, belonging to N. B. Pickenpaugh.

On August 28, 1903, respondent, N. B. Pickenpaugh, and wife, conveyed to their son and corespondent C. A. Pickenpaugh, the west half of the northeast quarter of section 7, and the northwest quarter of the northwest quarter of section 8, all in township sixty-five of range twenty, leaving N. B. Pickenpaugh the record owner of the northeast quarter of the northeast quarter of said section 7. That he remained the owner thereof until after the issuance and levy of the execution on the 9th day of August, 1905, which was issued August 7th, upon the judgment aforesaid

for $1,750. After the levy and seizure as above mentioned, this deed was changed and erased, and when so changed it was a deed to the north one-half of the northeast quarter instead of the west one-half of the northeast quarter, as it was at the time of its execution and delivery, and at the time of the issuance and levy of said execution. The deed in this changed condition was, on the 17th day of August, 1905, refiled and rerecorded, without being reacknowledged. That respondent C. A. Pickenpaugh had the scrivener who wrote the deed to make the change above mentioned by erasing the letter ''W'' from the deed and writing the word ''North'' in lieu thereof, making the deed read ''North one-half'' instead of ''West one-half,'' as it read at the time it was acknowledged and recorded.

The date of the contract by which N. B. Pickenpaugh employed Harber & Knight and Childers Brothers to bring suit for him against the railroad company was November 30, 1901.

Some little time prior to the time N. B. Pickenpaugh conveyed the one hundred and twenty acres to his son, he also conveyed one hundred and twenty acres to one Williams, and on the 26th day of April, 1904, he conveyed to Jacob W. Pickenpaugh, his father, a resident of Iowa, one hundred and twenty acres.

On May 22, 1903, an execution was issued on a judgment, dated April 10, 1903, in favor of the National Bank of Unionville and against N. B. Pickenpaugh for $261.36, interest and costs, amounting to $310.11. The sheriff's return shows that on May 28, 1903, he made diligent search, and finding no personal property belonging to N. B. Pickenpaugh on which to levy the execution, etc., he proceeded to and notified him that he could claim his homestead exemptions, but that he refused to do so; whereupon the sheriff selected three disinterested householders who valued and set off his homestead. Then follows a descrip-

tion of the land so set off to him, which was a part of the four hundred and eighty acres of land he owned in Putnam county. The sheriff's return on the execution further shows that he, on the same day (May 22, 1903), levied upon all the right, title and interest of said N. B. Pickenpaugh in and to the following described lands, to-wit: The north half of the southwest quarter and the southeast quarter of the southwest quarter of section six, and the north half of the northeast quarter of section seven, and the northwest quarter of the northwest quarter of section eight; all in township sixty-five, range twenty. The return also shows that all of this land was advertised to be sold on August 27, 1903, and that on the 26th, the previous day, N. B. Pickenpaugh paid the sheriff $310.11, the full amount due on the execution in the manner hereafter stated, and the execution was returned fully satisfied. This return was made the day before the date of the deed from N. B. Pickenpaugh to C. A. Pickenpaugh.

Plaintiff also showed that Jacob W. Pickenpaugh, the father of N. B. Pickenpaugh and the grandfather of C. A. Pickenpaugh, the son of N. B., knew of the contract existing between N. B. Pickenpaugh and Harber & Knight and Childers Brothers regarding their attorney fees in the railroad damage suit, and that he did not intend to pay it if he could prevent doing so; and that Jacob did not think their claim was an honest claim against N. B. Pickenpaugh.

C. A. Pickenpaugh had lived with his father up to the date of his marriage, which was on the 10th day of April, 1901, and he was then twenty-two years of age. Shortly after his marriage he moved to the 120-acre tract of land his father subsequently sold to Williams, and lived there almost a year. He then moved from there to the land conveyed to him by his father and mother on August 28, 1903, and has lived there ever since. The annual rental of those lands were

worth from $1.50 to $2.00 per acre, and he paid no rent therefor whatever during the two years he lived on them.

Before his father sold the one hundred and twenty acres to Williams he gave C. A. Pickenpaugh a house, which was standing on the Williams tract, and C. A. moved it over on the tract he had acquired from his father, but the record nowhere discloses the value of the house.

At the time C. A. Pickenpaugh acquired the one hundred and twenty acres of land from his father he had no money and but little property, a horse or two, a cow and about $100 worth of corn. The consideration expressed in the deed from N. B. Pickenpaugh to his son C. A. was $3,600.

After N. B. Pickenpaugh had agreed to dismiss his suit against the railroad company, C. A. Pickenpaugh, his son, telephoned Childers Brothers, at Milan, that the suit had not been settled and that there was then in the neighborhood a railroad man subpoenaing witnesses in the case, and thought they should look after the case, etc.

In response to that telephone message Childers Brothers wrote the following letters:

"Milan, Mo., May 9, 1903.
"N. B. Pickenpaugh, Esq.,
"Lucerne, Mo.

"Dear Sir: We had a 'phone message from your son this morning, purporting to be authorized by you, stating that the case against the R. R. Co. had not been dismissed, and that the Co. was now subpoenaing witnesses to appear at Kansas City on Monday. We are exceedingly sorry that matters are as they are, but feel that it is no fault of ours. You took the matter in your own hands and notified us that the case would be dismissed, and that our services were no longer needed. We thought at the time the R. R. Co. had

taken advantage of your unfortunate condition and had worked upon your fears of defeat until you had concluded that it was useless to proceed further.  It is now impossible in the limited time we have to subpoena witnesses in the case for Monday, and all we could hope for would be a continuance.  We are only too sorry that matters are not in a shape so we could present your injuries in all their seriousness at this term of the court, but it is impossible to do so now. We beg to say, however, if you desire either ourselves, or Col. Harber, to go to Kansas City Monday and do what we can to secure a continuance, you can wire us or him, and your rights will be strenuously protected.  Again expressing our sorrow, we are.

"Respectfully,

"CHILDERS BROS."

"Milan, Mo., May 28, 1903.

"N. B. Pickenpaugh, Esq.,

"Lucerne, Missouri.

"Dear Sir:  A few days since we had a 'phone message from your son, C. A. Pickenpaugh, purporting to be authorized by you, in which he said you had instructed him to 'phone us and tell us the case against the Milwaukee Railroad had not been dismissed, and trying to induce us to still make another trip to Kansas City and incur still further expenses to protect your interests in the case.  At that time we told the boy you had secretly come to Milan and had secretly attempted to settle with the stenographer for taking depositions at Harris, and that when we learned you were here you refused absolutely to talk with us, or to have anything further to do with us, informed him you had told us the case was dismissed and settled, and that we were discharged, and that you had then said to us you would not pay us one cent for time or expenses.  We then told him that under the circumstances we would not, and could not go to

Kansas City, and for him to tell you to arrange at once to pay us a fee of $2,000.

"Now Mr. Pickenpaugh, we learn that at the time you sent C. A. Pickenpaugh, to 'phone us, you had secretly accepted from the Railroad Company a large sum of money as a compromise and settlement of the case, and at that time had agreed and arranged that the case should be dismissed, and that in pursuance to this compromise and arrangement it was called and dismissed on the 20th day of this month.

"Now, you have run us all over the states of Iowa and Missouri, and we have been going here and there at every beck and call that it pleased your mind to make, and at the cost of our own time and money, and now you swear for all this you will not refund or pay us one cent. Is this your idea of justice between man and man? Now, the firm of Harber & Knight and this firm together have spent in cold hard cash of their own money about $500, in chasing evidence, which in your imagination would assist you in securing compensation for your injury, and it is not our purpose to lose this, or the time consumed in running round for your benefit.

"How much you got for this compromise and settlement we are not advised, but under the contract we are entitled to one-third of it, and we demand that you remit that pro rata at once, or in lieu of the one-third, if you will pay us $2,000 we will accept that sum and be satisfied. Take your choice, one-third of the amount compromised for or $2,000.

"Let us hear from you by return mail, and without delay.                    Respectfully,

"CHILDERS BROS."

Childers Brothers received no reply to any of the three letters before copied.

On April 26, 1904, without notice to Jacob W. Pickenpaugh, his son, N. B. Pickenpaugh, conveyed

to him the one hundred and twenty acres of land before mentioned for a consideration of $3,000, and started at noon on that day to the home of Jacob W., in Iowa, for the purpose of delivering the deed and collecting the purchase money, and by a circuitous route reached there that same night, sometime between nine and twelve o'clock. That was the same day the judgment of $1,750 was rendered against him for the attorney fees.

Plaintiff offered and read in evidence the tax-book for the year 1902, showing the assessment of N. B. Pickenpaugh, which shows under the head of "horses" —18, value $400; "mules," 1, $10; "neat cattle," 105, value $1,280; "sheep," 5, value $5; "hogs," 8, value $20; "other personal property," $470; total valuation by assessors, $1,785.

Claud Pickenpaugh, horses 3, value $60; live stock, neat cattle, 2, $25; hogs 3, $10; all other property, $35; total value $130.

Plaintiff offered and read in evidence the tax-book of assessment of 1903, showing the assessment of N. B. Pickenpaugh, horses 22, value $460; mules 1, value $20; neat cattle, 97, value $1,648; sheep, 4, value $4; hogs, 24, value $48; all other personal property, $179; total $2,359.

Claud Pickenpaugh, same year, same book: Horses, 3, value $75; cattle 3, value $40; hogs 2, value $5; all other personal property, $25; total $145. The tax list first read, being made in the year 1901, for the year 1902, and tax list second read being made in the year 1902 for the taxes for the year 1903.

Plaintiff offered and read in evidence tax-book list for N. B. Pickenpaugh and C. A. Pickenpaugh, made in 1903, for the year 1904; Pickenpaugh, N. B.: Horses, 8, value $175; neat cattle, 34, value $475; sheep, 3, value $5; hogs, 7, value $20; all other personal property, class 3—4 and 10, $80, total value $755.

Pickenpaugh, C. A.: Horses, 5, value $125; neat cattle, 4, value, $60; hogs, 5, value $15; all other personal property, $45; total value $240. There being no lands at either year mentioned assessed to C. A. Pickenpaugh.

It was also shown that prior to the rendition of this judgment, N. B. Pickenpaugh had disposed of all his live stock, and on that day had no real or personal property which was subject to execution.

The testimony introduced by defendants will elucidate some of the transactions before mentioned.

The testimony for defendants tended to show:

A deed of trust from N. B. Pickenpaugh and wife to the Connecticut Mutual Life Insurance Company, dated November 20, 1901, for the sum of $4,200, with interest, conveying the southwest fractional quarter of section six, the north half of the north half of section seven, and the northwest quarter of the northwest quarter of section eight, all in township sixty-five, range twenty, containing two hundred and forty-three acres, including the land involved in this suit.

Also a second deed of trust executed by N. B. Pickenpaugh and wife to B. H. Bonfoey, of same date, conveying same land to secure a note for $300, with seven per cent interest; also a note for $210, payable in five annual installments. Both of said deeds of trust were duly recorded.

Defendants introduced the execution before mentioned in the statement of plaintiff's case, which will render it unnecessary to restate its contents here.

Squire Valentine testified, substantially, as follows:

DIRECT EXAMINATION: Q. Where do you live? A. I live about ten miles south and west of here, Jackson township. Q. Do you know N. B. Pickenpaugh and wife? A. Yes, sir. Q. And C. A. Pickenpaugh? A. Yes, sir. Q. I will ask you to look at plaintiff's exhibit "C," being the deed from N. B. Pickenpaugh

and 'wife to C. A. Pickenpaugh, and state to the court who wrote that instrument? A. Yes, sir; that is this deed, I wrote it myself. Q. Do you know what land N. B. Pickenpaugh sold to C. A. Pickenpaugh? A. Yes, sir, I know; don't know as I could call the number of it. Q. You may refresh your mind by looking at the description in the deed? A. Northwest of north section 8, township 65 of range 20, and eighty acres of the north half of the northeast quarter of section 7, township 65, range 20. Q. Now, Squire, when the parties came there they told you what land Pickenpaugh had sold to his son? A. Yes, sir; I went to Mr. Pickenpaugh's house to make that deed. Q. And that's the land they told you? A. Yes, sir. Q. You notice there where the word "north" is written over an erasure; how did you write that in the first place? A. N. half, instead of north. Q. Well, how does it come that the word north is written in place of that? A. Claud Pickenpaugh came to my place and said that there had been a mistake in the recording of it, and they couldn't make it out anything only a "W" instead of an "N," and wanted to know what to do about it, and I erased the word "N," and wrote north, and wrote a note to Underwood and told him that I had erased that. Q. Do you know who took the deed 'when it was first written and acknowledged? A. I think I turned the deed over to Claud Pickenpaugh. Q. The parties were all present? A. Yes, sir; and N. B. Pickenpaugh and his wife both read the deed. Q. Do you know the land out there that was conveyed? A. Yes, sir; I am pretty well acquainted with it; been all over it. Q. Do you know whether N. B. Pickenpaugh owned the west half, south forty of the west half? A. Don't think he did. Q. Do you know who does own it? A. No, sir; I don't.

CROSS-EXAMINATION: Q. When did you first learn that N. B. Pickenpaugh wanted to make a deed? A. The day I made it. Q. Never heard of it before? A.

No, sir.  Q.  His son 'was living there at that time?
A.  Don't think he was living in the house with N. B.
Q.  Was his son married at that time?  A.  Yes, sir.
Q.  How long have you known the young man, C. A.?
A.  I have known him ever since we were boys together.
Q.  He was raised on his father's place and in his
father's household?  A.  Yes, sir.  Q.  The considera-
tion is $3,600; who told you to put that in?  A.  I
suppose they did, I don't remember.  Q.  What else
did they tell you there, if anything?  A.  I don't re-
member what they told me, what they did tell me, now.
Q.  No mention in it about assuming a debt or any-
thing of that kind?  A.  I don't know; the deed will
tell it.  Q.  Was you informed anything about that?
A. No, sir.  Q.  Don't know anything about it; from
what you learned of them?  A.  They didn't tell me
anything themselves, I don't think.  Q.  You don't
know anything about that trade?  A.  No, sir; just
suppose it was a trade and they called me in to make
the deed.  Q.  You didn't see any money paid?  A.
No, sir.  Q.  Didn't see any notes given?  A.  Well,
I don't know as I did; I don't remember about that.
Q.  Do you have any recollection of seeing any money
paid or notes given there that day?  A.  Well, I don't
recollect whether I did or not.  The understanding
was, the way I understood it was that C. A. Picken-
paugh was getting the money from his grandfather to
pay.  Q.  Who did you understand that from?  A.
Well, I understood it from C. A. Pickenpaugh and his
grandfather.  Q.  His grandfather wasn't there?  A.
Yes, sir.  Q.  Did you make a deed to his grandfather
at that time?  A.  I made a trust deed or mortgage.
Q.  What was done with that?  A.  His grandfather
took it.  Q.  You knew C. A. Pickenpaugh had noth-
ing?  A.  I don't know anything about what he had.
Q.  You lived there in the neighborhood and knew all
the land in the neighborhood?  A.  Of course he didn't
own any land.  Q.  You knew he had no personal

property. You never knew him owning any up to that time? A. Owned some; a team, and cows and such as that. Q. I say was that all you ever knew of him owning? A. It is all I ever knew personally of him owning; I know he had a team and some cows and horses and such as that. Q. How much was all the personal property that you knew of him owning worth at that time? A. I don't know. Q. Couple hundred dollars? A. Yes, sir; I expect more. Q. Well, how much? A. I don't know. Q. Sometime in August last C. A. Pickenpaugh came to you and told you this deed was recorded as being the west half in place of the north half? A. Yes, sir; sometime this last summer. Q. Who else was present at that time? A. My wife and children. Q. And you observed the deed at that time? A. Yes, sir. Q. He had been to the recorder with it prior to coming to you to get the recorder to correct it? A. I think he had. Q. And told you the recorder would not correct it? A. Yes, sir. Q. The recorder said it was recorded as it was written? A. Said it was recorded as the west half in place of the north. Q. Then there was nobody else there except you and your family and C. A. Pickenpaugh? A. No, sir. Q. You made this correction there perfectly apparent, putting the north half in place of the west half? A. Yes, sir. Q. And handed it back to C. A. Pickenpaugh? A. Yes, sir. Q. And that was the 17th of August? A. Don't remember what time it was. Q. You never took a reacknowledgment of it? A. No, sir. Q. And the deed—he left with the deed for the purpose of having it recorded? A. Yes, sir, he told me he wanted to get it changed on the record, or rerecorded. Q. This correction that you made there now is perfectly apparent, isn't it? A. Yes, sir; there's where I corrected it; it was an "N" there in place of "North." Q. You have erased the letter that was recorded by the recorder and written in the word

"North" adding the figure one-half? A. The figure one-half was there. Q. Were these figures that appear there now there then? A. I think they are. Q. Wasn't that one-half made at the same time you wrote the word "North" there? A. Well, I don't remember, but I had to erase that to get the word "North" in. Q. You did erase something in the deed? A. I erased the letter "N." Q. And the one-half was in there, I will ask you if you didn't also erase the half? A. I don't know. Q. Wasn't that half made at the same time and with the same pen and ink as the word "North?" A. It looks like the same ink, and it might be I erased it to get the word "north" in; looks like the same ink. Q. It was not made at the same time the body of the deed was written in? A. It don't look like the same ink.

REDIRECT EXAMINATION: Q. Mr. Harber gets you to say that you erased "W" there and wrote "North." Did you mean to say that? A. I didn't erase "W," I erased the letter "N," that's the letter that I erased was the letter "N." Q. Do you know whether or not he did make a loan of his grandfather? A. I think if I ain't mistaken, I wrote the mortgage or trust deed. Q. You wrote the note? A. I think so, from Claud to his grandfather. Q. And Claud and his wife both signed it? A. Yes, sir. Q. And signed the deed of trust? A. Yes, sir. Q. That was to Jacob, the grandfather? A. I don't remember his name, only Claud's grandfather Pickenpaugh.

RE-CROSS EXAMINATION: Q. If the letter "N" was so plain, then what would be the use of erasing it? A. It was plain to me but I don't suppose it was to the recorder. Q. He told you he had been to the recorder and tried to get him to record it as an "N?" A. Yes, sir. Q. And when the recorder refused to do it and insisted upon it being a "W," then you took your pen and erased it and changed it? A. Yes, sir; I did, and it was the letter "N."

Mr. Arthur Young testified as follows:

DIRECT EXAMINATION: Q. What official position do you hold? A. Collector of Jackson township; township taxes. Q. You know the Pickenpaughs? A. Yes, sir. Q. Do you know of this land that Claud bought of his father? A. Yes, sir. Q. Can you give the numbers of it? A. Well, I don't say that I can, but I think the north half of the northeast quarter of section 7; but the forty, I couldn't say I could give that. Q. It is right east of it? A. Yes, sir. Q. Can you give the numbers of it? A. Yes, sir. Q. You have a farm adjoining that? A. Yes, sir. Q. Do you know whether or not this land that Claud bought of his father in 1903 was advertised for sale under an execution? A. Yes, sir. Q. Was there anything said to you about buying it? A. Yes, sir. Q. Why did they want to sell it? A. For to pay off a security note. Q. A bank judgment? A. Yes, sir. Q. What did they offer you the land for? A. $25 an acre. Q. What would you say the land was worth? A. I had offered him $25 before that and he wouldn't take it? Q. Who had been paying the taxes for that since that time? A. Claud Pickenpaugh. Q. Who has been farming it? A. Claud Pickenpaugh as a renter. Q. Wasn't he farming it that year, 1903, remember when he rented it? A. Well, I think he plowed some that fall; I think he bought it in 1903.

CROSS-EXAMINATION: Q. How long have you been collecting taxes up there? A. I collected two years before this year. Q. You collected in 1903-4 and 5? A. Yes, sir. Q. How much property has Claud Pickenpaugh been paying taxes on aside from this land, if any? A. Well, I don't know as I can say exactly? Q. I don't expect you can tell exactly? A. Two or three hundred—about three hundred. Q. How long have you known him? A. We were boys together. Q. How old are you? A. Thirty-two. Q. Prior to his marriage where did he live? With whom? A.

With his father then. Q. How long has he been married? A. Four years. Q. How long after he 'was married until he moved onto this land? A. About a year and a half, I reckon. Q. Where did he live that year and a half? A. North of Central City. Q. On part of his father's land? A. Yes, sir. Q. The part that he afterwards conveyed to Claud's grandfather? A. No, sir. Q. Conveyed to Mr. Williams? A. Yes, sir. Q. Where did his grandfather live then? A. I think in the east end of the county. Q. How long has it been since he lived in this county, the grandfather, Jacob Pickenpaugh? A. Well, I can't just say when he left, but he came from Plano, Iowa, to pay his taxes last year. Q. And this is about the same quality of land as they conveyed to the grandfather? A. Yes, sir.

Mr. Jacob Pickenpaugh testified as follows:

DIRECT EXAMINATION: Q. Mr. Pickenpaugh, where do you live? A. I live at the present time in Plano, Iowa. Q. Where had you lived before going to Plano? A. In Grant township, east part of this county. Q. How long had you lived in this county? A. About forty years. Q. You are the father of N. B. Pickenpaugh and grandfather of Claud Pickenpaugh? A. Yes, sir. Q. Were you present at your son's, N. B. Pickenpaugh, in August two years ago, when N. B. Pickenpaugh and his wife made a deed to Claud Pickenpaugh? A. Yes, sir. Q. You may state, Mr. Pickenpaugh, whether or not you made a loan of money to your grandson at that time? A. Yes, sir; I loaned him $310.20, if I am not mistaken. Q. Did you take your grandson's note for it? A. Yes, sir; took a mortgage on the forties of land. Q. Were these the same forties of land that his father deeded to him? A. Yes, sir. Q. You saw the land, did you? A. Why, yes, sir; I have seen the land a number of times. Q. Can you tell if it lays, the three forties in a string, east and west? A. Yes, sir. Q. And joins

right up to his other land on the west of it? A. It corners with the land that N. B.'s house is on, I think. Q. Do you know what their purpose was in selling this land? A. Well, yes, sir; I think I do. Q. Tell the court? A. The purpose was to pay his honest debts. Q. Was there any debts then pressing him? A. Yes, sir. Q. What debt was it? A. A debt that the bank had against N. B. Q. Had an execution out? A. Yes, sir; and the land advertised for sale. Q. Now, to whom was that $310 paid? A. Why, that $310 was paid to Sheriff Crooks. Q. Who paid it? A. I did. Q. And your grandson gave you a note and deed of trust for it then? A. Yes, sir.

CROSS-EXAMINATION: Q. Let me see that note, please? You say this was all one transaction, the making of the deed and the giving of the note? A. All done at the same time. Q. And all on the same date? A. Yes, sir; Mr. Valentine drawed the note and drawed the mortgage. Q. And you still have the note? A. Yes, sir; I have the note and mortgage. Q. Mortgage on the same land? A. Yes, sir. Q. Recorded? A. Yes, sir. Q. Note has never been paid to you? A. Why no; if it was I wouldn't have the note, I presume. Q. Mr. Pickenpaugh, your son, N. B., at that time had a considerable amount of stock on hands, did he not? A. Well, yes, sir; I think he had some stock; I don't know how much though. Q. Had ninety-seven head of cattle, didn't he, on the place at that time? A. No, I think not that many at that time. Q. You don't know whether he had ninety-seven head of cattle and twenty-seven head of horses? A. No, sir; he had some horses and cattle, but how much he had, I don't know. Q. He was quite a large farmer and continued so until he conveyed his land, part to his boy and part to you? A. Why, he had some left. Q. He conveyed part of it to you afterwards? A. He conveyed one hundred and twenty acres to me, but I paid him for it. Q. Conveyed it to you when you

were not in this State? A. I lived, when the deed was brought to me, I lived in the State of Iowa. Q. He conveyed the land to you when you were not here and not even in the State? A. I have told you. Q. Tell me again? A. He brought the deed to me in Plano in Iowa. Q. And did pretend to have a deed made to you on the 26th day of April, 1904; was you in this county or State at that time? A. No, not on that date, I wasn't. Q. Then you wasn't here when that pretended deed was made to you and even when it was recorded? A. No, sir; I sent it to the recorder. Q. When did you first learn of that deed? A. If it is necessary for me to go into details, I will tell it. When I first learned of the deed. Q. By the Court: That is 'what he asked you? A. I had let N. B. have $600 in money and at the time I made a contract with him that I was to have one hundred and twenty acres of land there and assume a mortgage of $2,400 and give him $600 when he made me a deed; and he brought me the deed and I gave him the $600. Q. Were you in this county or in this State at the time that the deed purported to have been made to you on the 26th day of April, 1904? A. No, I was in the State of Iowa. Q. You know nothing about him going to Squire Helferstine at that time and trying to have him make a deed and take his wife's acknowledgment over the telephone? A. I don't know anything about the deed; all I know about the deed is simply this; we had a contract that I was to assume the payment of that $2,400, and when he made me a deed I was to pay him $600, and that's 'what I done. He brought me the deed in Iowa. Q. When was it brought to you? A. I think he brought it, I wouldn't say positively as to the date. I think though it is just probable, maybe the next day after it was made; I ain't sure about that; wouldn't say positively. Q. Did you know court was in session here at that time? A. Well, I don't remember. Q. Did you know

there was a suit pending against him at that time. A. Probably I did. Q. Don't you know as a matter of fact that the very day that this deed purports to have been made to you for the one hundred and twenty acres of this land, the 26th day of April, 1904, that your son, N. B. Pickenpaugh, was right in this court pretending to desire a continuance in this very case in order that his lawyer might get here, and during the time that he was so pretending, that he made this deed? A. I don't know about that. Q. Didn't he tell you there was a suit against him? A. I don't recollect whether he did or not. Q. Do you pretend to tell the court that you don't know there was a suit pending then at that very time? A. I may have known it, I am not positive about that; don't know whether I did or not. Q. Didn't he tell you he had left his wife in town and that they would telephone for him and he came there to tell you about the suit? A. I don't know anything about that; I know he brought me the deed and that's all I know about it; I wasn't there. Q. Did you give him $600 by check or count it out in cash? A. Counted it out in cash. Q. Had it there in the bureau drawer; where did you have it? A. I had it in the safe. Q. At home? A. I have got a safe and I keep my valuables there. Q. How much other money did you have there? A. Well, I don't just remember how much; probably from $600 to $800 more. Q. You had from $1,200 to $1,400 in your safe? A. I think I had about $1,500. Q. And you just counted him out the cash on the day he brought you the deed? A. Yes, sir. Q. You don't know whether he told you he left court and there was a suit pending against him? A. No, sir; don't recollect of him telling me anything about it. Q. You say you had some kind of an agreement before that at some time, when he would make a deed to a one

hundred and twenty acres; the time, was not set? A. I don't think there was any specific time set for him to make it. Q. But at such time as he saw fit to make it you would assume $2,400? A. He wanted me to take the land and pay the $2,400 debt for him and let him have some money to pay some other debts that he was owing, and in order to help him out, I done it. Q. You had some talk with him before making this deed, in which you had told him that if at some time he would make you a deed to this land, you would assume $2,400 and give him $600? A. Yes, sir; I think we had a kind of a written contract. Q. Where is that written contract? A. I don't know just where it is. Q. When did you see it last? A. I think when I paid him the money I gave him up the contract. Q. Who wrote it? A. I think I wrote it myself. Q. Well, you know there was no time as to when the conveyance was to be made? A. I don't think there was if I remember right. Q. Or when the money was to be paid? A. I think as near as I remember about the matter is this, that when he made me a deed for that one hundred and twenty acres of land that I was to give him *$600 in money* and assume the payment of this $2,400, and I gave him the money and notified Mr. Brawford, he was the agent that the money was got through, and notified Mr. Brawford that I had got the land. Q. Have you ever paid the $2,400? A. No, sir; I have not paid the $2,400 but I have paid the interest on it. Q. At that time Pickenpaugh, your son, wasn't owing you anything? A. After I paid him the $600? Q. The consideration for the land was, you was assuming the debt of $2,400 and paying him $600? A. Yes, sir; there was other notes that I had paid for him at other times. Q. Did you count them? A. Not in that transaction. Q. You was just paying him the $600 and keeping these notes and other obligations to him? A. Yes, sir. Q. And in your talk

about the purchase of this land there was nothing said about you taking out your accounts against him? A. Well, he wanted the money, and wanted me to carry the other notes. I had a note against him that I paid Mr. Bonfoey, $321, I think it was; I have that note yet. Q. You was simply trading for the one hundred and twenty acres of land? A. I simply bought the one hundred and twenty acres of land to help him pay his honest debts. Q. You didn't know what the effect would be on a suit pending and judgment rendered if you wouldn't do this, did you, or stop to inquire? A. Why, no; I didn't know that, or stop to inquire anything about it. I just paid him the money as I had agreed to do when he made me the deed. Q. When had you been down to his house prior to this? A. Why, I hadn't been there prior to that; the day I let Claud have this money and this mortgage and notes to Claud was executed, that was the last time I had been there. Q. That was in 1903? By the Court: Was that when you made that contract? A. No, sir; when we made this contract about the one hundred and twenty acres of land he was at my house, come to see me. Q. When was the first time you ever talked about it? A. As near as I remember the time, kind of made a contract and wrote up a kind of agreement, was, I think, about the 18th of March, 1904. Q. No time specified when he was to make the conveyance? A. No particular time. Q. Do that whenever it suited him or if it ever suited him? A. If he didn't do it he wouldn't have got the money. Q. It was a matter of choice entirely with him? A. Yes, sir. Q. You entered into an agreement that if he ever saw fit to convey you the one hundred and twenty acres of land you would assume $2,400 or the mortgage, and pay him $600? A. That was the contract. Q. You kept it after it was written? A. I had it until he brought me the deed and when he brought me the deed I think I gave it up to

him. Q. Didn't he tell you he came from court here? A. I don't remember that he did or didn't. There's a direct railroad from our place, or within three miles of it, it goes down to Lucerne, and when he come to my place he came on that road. Q. Do you know what became of all his horses and cattle that he had at the time he was making you this deed? A. Don't know anything about that. Q. Nearly a hundred head of cattle and twenty-two head of horses and one mule? A. I think the Drumm Commission Company had a lien on his cattle and horses, too, probably, though I never saw it. Q. Do you know what became of the $600 you paid him? A. Well, I think he paid the Drumm Commission Company a part of it, but just how much of it I don't know—they were pressing him. Q. And when he made this conveyance to you he made such sales as to entirely strip himself of all property that could be got at upon execution? A. Well, probably he sold all the property that would be subject to execution. Q. Prior to that time he had always been good upon execution, hadn't he? A. I think so. Q. But after that time there was no chance to collect a dollar from him; after you and the son got through your dealing? A. We paid every dollar the property was worth. Q. You know the usual rule is not to loan to exceed forty per cent of the appraised value? A. I don't know. Q. You don't know who appraised it? A. No, sir; I don't. Q. You say you wrote this contract that you have mentioned between you and your son? A. I think so. Q. Where? A. At home. Q. When? A. If my memory serves me right I think it was on the 18th maybe of March, somewhere about that time. Q. You had talked with your son about this conveyance before that? A. Before. Q. The 18th of March, the day of your sale? A. Well, it is my mistake. Q. The day of the sale was the 28th of March? A. Yes, sir. Q. And you had talked with your son about it prior to the 18th of

March? A. Yes, sir; I think so. Q. And when first? A. Well, now, I couldn't tell you positively when, sometime during the latter part of the winter or about that time. Q. You lived in about twenty-five miles of your son ever since you left this county? A. Well, I guess it is further than twenty-five miles—thirty or thirty-five. Q. You keep in touch with his affairs all the time? A. Why, no; I don't keep in touch with his affairs. Q. What is this land worth an acre, for rent; the one hundred and twenty acres you have got; $2.50? A. I don't suppose it would bring that. Q. Well, about what; give your estimate? A. I suppose probably bring $1.75 or $2. Q. It is about the same value as land of your grandson? A. Yes, sir. Q. When did you leave? A. I left well—my sale was on the 28th of March, and I left, I think, the thirteenth day afterward. Q. 1904? A. Yes, sir. Q. All the papers in this county published the circuit court docket preceding court? A. Probably they do. Q. You always observed that as well as other news items from this county? A. Sometimes I look at it, most generally look over the docket. Q. Don't know why he said he should make a deed at this inopportune minute? A. Didn't make any statement. Q. He came and handed you the deed and you went down in your safe and got him the $600 and the contract and said, "Go, son?" A. I paid him his money according to the agreement. Q. How far from your house to Lucerne? A. Three miles. Q. To the railroad? A. About three miles, not quite three miles. Q. And you think he walked? A. I think so. Q. Now, Mr. Pickenpaugh, this suit here upon which this judgment was rendered on April 26, 1904, was brought to and pending in the November term, 1903, of this court, did you know that? A. I don't know whether I did or not. Q. Do you want this court to believe there was a suit pending for attorneys' fees against your son for $2,000, before he made this deed and you

was intimate with him, you at his house and he at yours, and you didn't know anything about it? A. I might have known there was a suit against him, I think likely I did. Q. Did you know there was a suit pending for $2,000 at the November term, 1903, and didn't you know that if your son told you it was continued, that he got a continuance because he couldn't get a lawyer that he pretended to employ in Iowa to come and try it? A. No, I know this; I know he went sometime to see Howell on some business, but my impression was that he was going to hire Howell to conduct a suit against the railroad company. Q. Tell the court whether or not prior to November, 1903, you were not taking a paper in this county? A. Prior to November? Q. Yes, sir; 1903? A. I think I was taking prior to November two of them. Q. How many times do you say your son Napoleon, between the 22d day of October, 1903, and the time of the delivery to you of this deed, in April, 1904, was in Iowa, at your house? A. Well, I couldn't tell positively. Q. Some half dozen times? A. Well, probably not that often, I don't remember just how often I saw him.

REDIRECT EXAMINATION: Q. Mr. Pickenpaugh, something said here about a suit your son intended to bring against the railroad company; when was your son hurt? A. Well, I couldn't give the date; I don't remember. Q. About four years ago wasn't it? A. I think so. Q. In 1901? A. Yes, sir. Q. What has been his health and ability to carry on his farm and conduct his business since that time? A. Well, he has had no health and a good deal of the time he is incapacitated for business, even to look after his interests. Q. Well, his business has been in a failing condition ever since he was hurt? A. Yes, sir. Q. Been going down? A. Yes, sir. Q. Well, Mr. Harber asked you about him having something like ninety-seven head of cattle and a lot of horses? A.

Yes, sir.  Q.  Do you know whether there was a mortgage for a considerable sum on that stock?  A.  Yes, sir.  Do you know what the mortgage amounted to?  A.  I don't know.  Q.  To what proportion of their value?  A.  I never knew what the amount of that mortgage was.  Q.  Now, you say that your recollection is that you executed that contract for the purchase of this land, you think, on the 18th of March, 1904?  A.  Yes, sir.  Q.  Did you give it up when you got the deed?  A.  I think so.  Q.  Do you recollect whether or not you entered a memorandum on the back of the contract of the date when you received the deed?  A.  Why, probably I did.  Q.  Look at this paper and see if you can tell what it is?  (Witness here handed paper.)  Q.  You say you gave the contract up at the time you got the deed—have you seen it since?  A.  No, sir.  Q.  Look at that and see what it is please?  A.  Well, that's a memorandum of the contract.  Q.  Is that the contract, the written contract that you and your son signed?  A.  Yes, sir.  Q.  Read it please?

By Mr. Harber:  Let me see it.  (Paper handed Mr. Harber.)

By Judge Higbee:  Now, read it please.

A.  "March 18, 1904.  This day N. B. Pickenpaugh has sold to J. W. Pickenpaugh the northwest quarter of section No. 7, township 66, and range 20 in Putnam county, Missouri, for $3,000; $2,400 on a loan on said land and $600 cash when deed is made."

Q.  Whose signature to that?  A.  N. B. Pickenpaugh and J. W. Pickenpaugh?  Q.  Are those the signatures of yourself and son, N. B.?  A.  Yes, sir.  Q.  And that the contract you spoke of as having written at the time?  A.  Yes, sir.  Q.  What memorandum is on the back of that?  A.  "Delivered April 26, and $600 paid."  Q.  What date is that, what year?  A.  1904.  Q.  Who wrote that on there?  A.  I did, it is my handwrite.  Q.  Was that the day he de-

livered the deed to you? A. I think so. Q. That whole contract is in your handwriting? A. Yes, sir. Q. Now, Mr. Pickenpaugh, I will ask you to state to the court whether or not you know of your son being indebted in any sum to Harber & Knight or Childers Brothers? A. Well, I know there was a contract drawn up between Harber & Knight, and they was to prosecute a case for him for thirty-three per cent of what they would get, and after that, sometime afterward, they drawed up another contract for fifteen per cent more. Q. I will ask you if you know whether or not your son owed them any money at the time you made this contract for the land? A. I knew that the contract existed, that they had never done anything in the case and wasn't justly entitled to a cent. Q. Did you know whether there was any indebtedness on the part of your son to them at that time? A. No, sir; he didn't owe them anything justly. Q. Why did you buy that land? A. To help him pay his honest debts. Q. The debts on these cattle and horses? A. I think part of the cattle and $2,400 of it was borrowed money, mortgage given for — Q. He used this money in payment of debts, this $600? A. Yes, sir. Q. Had you any purpose in buying this land to assist your son in defrauding any of his creditors? A. No, sir. I simply done it because I had the money and wanted to help him out if I could, I advanced him money several times; two or three different times. Q. He was owing you other money? A. Yes, sir. Q. To what amount? A. Well, to the amount of $300 that I paid to Bonfoey, $331 I believe it was I paid Bonfoey a year ago last November probably.

RECROSS-EXAMINATION: Q. That mortgage has never been satisfied, has it; the Bonfoey mortgage? A. No, sir. Q. Now, you know sufficient in detail of your son's business to know that there was a suit instituted against the Milwaukee Railroad Company

for $25,000 for personal injuries.  Answer yes or no?
A.  I don't know what the amount of the suit was
brought for.  Q.  You know of the details of it, even
the contract, the amount they were to receive?  A.
I saw the contract.  Q.  He showed you the contract?
A.  I think so, yes, sir.  Q.  Then afterwards the
case was removed to the United States Court?  A.
I don't know.  Q.  You know it got down to Kansas
City?  A.  Yes, sir.  Q.  And then you know it was
suggested that other lawyers be employed at Kansas
City; your son informed you of that?  A.  No, sir;
don't remember that he did.  Q.  You know very well
that a question arose as to the lawyers, and increased
the fee from thirty-three per cent to fifteen per cent
more?  He told you that?  A.  Napoleon showed me
the contract.  Q.  And that was the purpose of em-
ploying other lawyers.  Harber & Knight and Childers
was to pay half the fee of what they got and wanted
him to pay the other half?  A.  I didn't understand
it that way.  Q.  Then you understood he settled or
dismissed the suit, you knew that?  A.  Yes, sir.  Q.
And you know of your son dismissing the suit?  A.
Yes, sir; I know he dismissed it.  Q.  Then he told
you that Harber & Knight and Childers Brothers were
claiming a fee off him, but they never done anything,
and you say that, didn't he?  A.  Yes, sir; he told me
that Harber & Knight took four depositions was all
he done in the case.  Q.  But he told you they were
claiming a fee, did he not?  A.  Don't remember at
the time that him and I had that talk about it, I don't
think he made any claim of a fee.  Q.  When was
that?  A.  That was sometime after the case was dis-
missed, sometime after, I think.  Q.  And you say
they never done anything because he told you that,
you don't know yourself?  A.  No, sir.  Q.  You don't
know how many trips they made to Kansas City, or
how many trips to Iowa in taking depositions and
otherwise?  A.  All I know about it was what he said

and other parties. Q. Who took Davis's deposition? A. I think Knight maybe, I ain't sure about it; but some one took his deposition. Q. How did Pickenpaugh come to tell you they hadn't done anything if they wasn't making a claim for fees? A. Dilly-dallying the case along. Q. That's what he told you? A. That's the history of the case. Q. That's the history you got from your son, Napoleon, ain't it? A. Well, yes, I get it from him. Q. Then he has kept you in touch? A. And other parties. Q. What others? A. Mr. Culler out here for one. Q. Mr. Culler was one of the securities? A. Yes, sir. Q. So, you have talked to different parties about it? A. Yes, sir. Q. Was you down here at the November term of court when the case was to be tried? A. No, sir. Q. You supposed it would likely be tried at the November term, didn't you? A. I supposed likely that the case would be continued. Q. Why did you suppose that? A. Because he wasn't ready. Q. Who wasn't? A. Napoleon. Q. How do you know that? A. Well, he told me that he wasn't. Q. Told you he wasn't going to be ready before court met? A. Don't know as he told me before. Q. Well during the term? A. I learned it from him or other parties, I don't remember. Q. You learned he was not going to be ready at the November term, 1903? A. I am not positive about it now, I couldn't tell where I learned he wasn't going to be ready. Q. You tell the court you didn't think it would be tried at that term? Because you thought it would be continued? A. Yes, sir. Q. How did you get the impression? A. I couldn't say. Q. You said you understood your son wouldn't be ready and that it would be continued, that's the understanding you had? A. That was an impression of mine, don't know as I had a correct inference in the matter. Q. And you supposed it would be continued because you understood your son wouldn't be ready, isn't that true? A. That's my impression about the matter. Q.

Why didn't you come down at the April term, or was you fixing to come when your son came there? A. No, sir. Q. Why didn't you come at the April term? A. Because my business was such it required my attention. Q. You knew there hadn't been any services rendered, and this suit was coming up against your son, didn't you think you could do him good down here? A. Probably I could if I had been here; but I couldn't very well leave. Q. You testify you didn't come because your business demanded your attention? A. Yes, sir. Q. Otherwise you would have come? A. Yes, sir. Q. Had it not been for your business demanding your attention at home you would have been here? A. In all probability I would. Q. Now, if it was continued, at the November term, you knew it would come up at the April term? A. If it had been continued, certainly. Q. And you knew the terms of court here? A. I had lived here in this county for a number of years and knew when the terms of court came. Q. What time in the day did your son get up to your house that day he brought this deed? A. I think it was along in the evening. Q. How far was it from here to where you lived then; you now live in the same place? A. Yes, sir. Q. How far? A. I don't really know the distance, I suppose probably thirty-five or maybe forty miles. Q. How do you go to get there? A. Go from here to Sedan on this railroad and then you take the K. & W. west from Sedan and this town is twelve miles west of Centerville.

Mr. Claud A. Pickenpaugh testified as follows:

DIRECT EXAMINATION: Q. You are one of the defendants in this case? A. Yes, sir. Q. What is your age? A. Twenty-six. Q. Where were you born? A. In Putnam county, I think. Q. How long have you lived in the neighborhood of this land? A. Well, I have lived there ever since I was seven or eight years old. Q. When were you married? A.

April 10, 1901. Q. And before you were married you lived at home, did you? A. Yes, sir. Q. Where have you lived since your marriage? A. Two years north of Central half a mile. Q. Where is that? A. It was a mile north of home. Q. You lived there a while, and then where have you lived since that time?. A. Well, I lived down on the place pa sold to grandpa; moved there sometime in March and moved off sometime in September on to the place where I now live. Q. What year? A. 1903. Q. Now, you may tell the court about the circumstances of your buying this one hundred and twenty acres of land from your father? A. Well, the land was advertised. Q. By whom? A. By the National Bank. Q. Under an execution? A. Yes, sir. Q. Then what did you do? A. Well, I talked to him about it and asked if he was going to pay it off, and he said he didn't know where he could raise the money; I told him if he would sell me one hundred and twenty acres I would try and raise it, which I did. Q. You brought up the matter of the sale? A. Yes, sir. Q. What was your purpose in doing that? A. To pay off the execution and stop the sale. Q. What did you agree to give your father for this land? A. $3,000 and a little over. Q. How was it to be bought? A. I agreed to raise the money to pay off the execution, that was $310.21, I borrowed that of grandpa. Q. Where did you see him and get the money? A. He was at home. Q. You went to his home? A. I sent pa to see if he had the money, and if he had, if he would loan it to me. Q. Go ahead and tell what occurred? A. Well, grandpa came up, and I told him before this; he owed me in the first place $128 for corn. Q. Who? A. Pa; and owed me $100. Q. For what? A. For a horse. Q. When did you let him have it? A. Didn't let him have it; James Alexander got the horse; he owed Alexander and I let Alexander have the horse, and took the account off him, $100. Q. What else? A. Well, sir;

during harvest I hired a hand and helped him put up his hay, we exchanged work, and the creek washed my hay down and I paid the hand $28 in cash, and he owed me the same, and he owed me $128 for corn. And I turned him over two horses at $200. Q. $56 for help with the hay, $128 for corn, $100 to Alexander and $100 two other horses; and this $310 you borrowed from your grandfather? A. Yes, sir. Q. Know whether incumbrances on this land? A. Yes, sir. Q. How much? A. On the two hundred and forty acres there was $4,500, I bought half of the land and assumed half of the incumbrance, which would be $2,250. Q. How about this $300 to Bonfoey? A. That makes $4,500. Q. So the items you have enumerated and the $2,250 makes how much? A. $3,044.25. Q. This $210 note, did you assume that $210? A. That $210 note I think was payable in installments as interest, I paid my part of the interest. Q. Well, the amount that you assumed was $2,250? A. Yes, sir; and I placed $310 on it myself. Q. Now, Mr. Pickenpaugh; why did you buy this land? A. To save the home place. Q. Did you buy it to defraud creditors? A. No, sir. Q. Did you know of your father owing these gentlemen? A. No, sir. Q. Childers Bros. or Harber & Knight? A. I did not. Q. Had you ever heard anything about that? A. He never did tell me his business, and I never meddled with it. Q. This was before the suit? A. Yes, sir. Q. This was in August? A. Yes, sir, 1903. Q. And the suit was October 22d following? A. Yes, sir, I think so. Q. Who wrote the deed? A. W. A. Valentine. Q. Can you give the description of the land that you bought from your father? A. Well, I bought the north half of section 7. Q. Well take the deed and see if you can describe it? A. Forty acres of the northwest of the northwest of section 8, township 65, range 20, and 80 acres of the north half of the northeast quarter of section 7, township 65, and range 20. Q. Now then, Mr. Pickenpaugh,

did your father own the west half of the northeast quarter? A. No, sir. Q. You bought the north half? A. Yes, sir. Q. Is that what you and your father told Valentine to write in the deed? A. Yes, sir; and he told me when I took the deed to him the letter was an "N." Q. Did you see and read the deed? A. Yes, sir. Q. What was the letter? A. I presume it was an "N." That's what I thought it was, and he said positively it was; said it was as plain as the nose on a man's face. Q. Now, Mr. Pickenpaugh, when did you discover that there was any misunderstanding about this being an "N?" A. Well, I discovered to the best of my knowledge on the 16th of August. Q. What did you have done then? A. I went to the justice that made it and had him correct it. Q. You talked to the recorder about it, didn't you—Mr. Underwood? A. No, sir; I never talked to him myself about it; I had Mr. Little to. Q. Did Mr. Little read it? A. I presume he did. Q. He is a pretty good hand at reading writing, isn't he? A. Yes, sir. Q. When was that you made this discovery that the recorder had written it as "W?" A. Well, it was day or two, probably three days before I took it to Valentine. Q. That was last August? A. Yes, sir. Q. And that's when he made the erasure and wrote the word "North" in there? A. Yes, sir. Q. After you bought the land, did you take possession of it? A. I had possession of it when I bought it. Q. You were cultivating it? A. Yes, sir; part of it. Q. Have you had possession of it ever since? A. Yes, sir. Q. What doing? A. Farming the most of it. Q. Who has paid the taxes? A. I have, also the interest. Q. Paid the interest on the mortgage, have you? A. Yes, sir. Q. What improvements? A. I moved a house and fixed it up and built a barn and corn-cribs—dug a well. Q. Living on the land? A. Yes, sir. Q. For how long? A. Since September, 1903? Q. Lived on the land? A. Yes, sir.

CROSS-EXAMINATION: Q. Up to the time of your marriage you lived at home? A. Yes, sir. Q. How long after your marriage did you live there? A. Two weeks. Q. What land did you move to then? A. Half mile north of Central. Q. What land? A. Land now owned by Williams. Q. Your father owned at that time? A. Yes, sir. Q. How long did you live there? A. Two years. Q. And from there you moved where? A. Moved down to the land that is now owned by grandpa. Q. You lived there one season? A. Just a part of a season. Q. When did you move on the land in question? A. September. Q. What year? A. 1903. Q. You had worked at home all the time prior to your marriage? A. Yes, sir. Q. What property did you have at the time of your marriage? A. I had a team and some hogs, don't remember how many, and a couple of cows. Q. You gave in the amount you had? A. Yes, sir. Q. For each year? A. Yes, sir. Q. So the assessment will show? A. Yes, sir. Q. The amount and value? A. The assessor's value. Q. Half their value, say? A. Don't know whether it is or not. Q. That was the only property you had, the property you gave in to the assessor? A. That was all except the crop I raised. Q. You seem to have had about the same number of horses each year, how did you get some to sell to your father? A. Look up the records and see, I had two in 1904. Q. How many in 1903? A. Five, sold three. Q. How many in 1902? A. Had three, I think. Q. Now then, how many in 1902? A. I think I had three. Q. And how many in 1903? A. Had five. Q. You say you never interfered or meddled with your father's business? A. No. sir. Q. How did it happen at that minute you stepped in and said, "I will pay off this execution?" A. It was necessary. Q. He had ninety-seven head of cattle? A. I don't know how many. Q. He was a large feeder at that time? A. No, sir; not at that time. Q. That

was 1903? A. Yes, sir. Q. Assessment for 1903, how many head do you say he had in 1903? A. I don't know. Q. He was a large stock feeder and grower? A. Not so very large. Q. Averaged from ninety-four to ninety-seven cattle, and had horses? A. Had some, but I don't know how many. Q. You had never borrowed any money before in your life? A. No, sir, never any money. Q. Never tried to do any business before of that kind in your life? A. What business I had to do I had the capital to do it with. Q. You never bought any land before? A. No, sir. Q. Never traded with your father any before? A. Yes, sir; I traded with him before. Q. What had you traded? A. Sold him hogs and such like several times. Q. Never traded him lands? A. No, sir. Q. Now, your trade, was you to assume $2,400? A. $2,250 and the interest. Q. These coupons or notes that have been taken on the $300 and $500 were coupon notes? A. I suppose so. Q. You pay them annually? A. Yes, sir. Q. Take them up annually? A. Yes, sir. Q. You get this coupon when you pay the annual interest? A. That $300 is a loan. Q. That's in the $4,500? A. Yes, sir. Q. $4,200 mortgage and $300 mortgage and $210 was commission note to Mr. Bonfoey? A. Yes, sir. Q. You traded along and your father got to owing you for a horse and stacking the hay and some horses you sold somebody else, and all at once you concluded you would borrow money from your grandfather and buy this land? A. I thought if I could raise the money and pay off the judgment I would buy the land, and done it. Q. You didn't pay your father a dollar at the time? A. Turned him over two horses at $200 and he paid me what he owed me. Q. And you receipted him for the stacking of the hay account? A. Yes, sir; and also for the hired hand. Q. Valued the land at $3,000? A. Yes, sir. Q. That's what it is worth to-day? A. Ain't worth any more. Q. What worth

an acre to rent? A. I don't know. Q. Your deed was made when? A. August 28, 1903. Q. Had you talked with Childers Brothers, you know them? A. Yes, sir. Q. Had you talked with them at any time regarding the suit of your father? A. I think once. Q. Over the telephone? A. Yes, sir. Q. Where were you at that time? A. I was at Arthur Young's. Q. That was the time you told them that your father had told you to tell them the case against the Milwaukee had not been dismissed? A. I didn't tell them that—I told them that ma told me. Q. And the railroad was subpoenaing witnesses? A. Yes, sir. Q. And you were talking to them with respect to the suit? A. Ma told me to talk to them. Q. You told them the suit had not been dismissed, that the railroad company was subpoenaing witnesses? A. Yes, sir. Q. On that day you were talking to them pretending to them your father had told them not to dismiss the suit, you took this deed from your father? A. I don't remember what date it was. Q. It was a few days before you took this deed? A. I know nothing about it. Q. You knew at the time your father had dismissed the suit? A. I know that he said in the spring that he had a notion to dismiss it, but didn't know. Q. But you told them your mother told you to tell them it had not been dismissed, and that was before you took this deed from your father? A. I don't remember whether it was or not. Q. Didn't Childers tell you in the talk over the 'phone that it certainly had been dismissed, that your father had come to Milan and secretly tried to settle with the stenographer that took the evidence and would not come to their office? A. I don't think he did. Q. Why did Childers tell you he thought the suit had been dismissed? A. I don't know that he told me that, he told me to watch the case carefully and let him know if anything occurred.

Q. Didn't he tell you your father had been to Milan and settled with the stenographer, and didn't come to his office? A. Don't think he did, to the best of my knowledge. Q. What became of all this stock your father had there? A. Sold it, I guess. Q. What did he do with the money? A. I don't know. Q. What became of the $600? A. I don't know. Q. How frequently did you see your grandfather between October 22d and April, 1904? A. Don't remember that I saw him at all. Q. Might have seen him a half dozen times? A. No, sir. Q. Were you at your father's house frequently? A. I was there several times. Q. How can you tell he put in the wrong description? A. I know what land I was to get, I never gave the justice any description. Q. Who did? A. Pa and grandpa gave him the description. Q. You don't know by numbers; you don't know the land by numbers? A. No, sir; but I know it. We got a tax receipt. Q. But you can't tell now what it was? A. No, sir. Q. Can you tell whether the deed was dated 28th or 29th? A. I use to know figures. Q. Look at that now and see if you still know them? A. I think that's the 28th. Q. The 8 made over a 9? A. 28th. Q. Has there been a figure 9 made there? A. No, sir; I can't see there is any figure 9 made there.

REDIRECT EXAMINATION: Q. What was the condition of your father's health after he was hurt? A. Very poor. Q. How did it affect his business? A. It affected his mind greatly. Q. Business declined, did it? A. Yes, sir.

Mr. J. W. Alexander testified as follows:

DIRECT EXAMINATION: Q. Where do you reside? A. At the present time I live at Pollock. Q. Where did you reside during the summer of 1903? A. Well, sir; my home partly was at my father's mostly. Q. Where was that? A. West of here about twelve miles. Q. Do you know Claud Pickenpaugh? A. Yes, sir. Q. You may state whether you got a horse

from them, tell the circumstance of it? A. Yes, sir; I bought a horse from—well, I got the horse from Claud, or it come through Claud, got it from Poly, but Poly got it from Claud, Poly owed me $180.15. Q. Who do you mean by Poly? A. Poly is the father of this boy, and I was over there to see him, and he was poorly, had poor health, and he proposed to sell me a horse, and he showed me a black horse that he wanted to sell me and I told him I didn't want it.

By Mr. Harber: Never mind, let us get at the facts.

A. Well, we looked through the horses and I didn't care to buy anything he had for the price that he had on it, and I went over to his son's where he had this 120 in controversy rented at that time. And he had a black filly there and I and Poly was looking at his colts, and I told him I wouldn't mind having this, and he wanted to know what I would give for her on that debt, said she belonged to Claud, I told him I would give him $100 on that debt, and so we went over to the field where the boy was plowing corn and he said I could have the filly and he would take his father for the debt. Q. Which Pickenpaugh was that? A. Claud Pickenpaugh.

Mr. U. G. Bishop testified as follows:

DIRECT EXAMINATION: Q. Mr. Bishop, do you know the defendants in this case, Mr. Pickenpaugh and Claud Pickenpaugh? A. Yes, sir. Q. You worked for Claud along about the winter and spring and summer of 1903? A. Yes, sir. Q. Do you know anything about Poly buying corn from Claud during the winter and spring? A. Yes, sir; I was there when Poly's hand hauled the corn off. Q. Then what work did you work at during the summer? A. Through harvest. Q. Who paid you? A. Claud. Q. Who hired you? A. Claud. Q. Where did you work? A. On Poly's place, they exchanged work; and this other field washed down. Q. How many days did

you work? A. Fourteen days. Q. Furnished a team? A. Yes, sir. Q. What did Claud pay you for that work. A. $28. Q. I believe you testified you saw Poly hauling the corn? A. His hand, Mr. Jacobs.

CROSS-EXAMINATION: Q. Were you out there at any time when corn was hauled at night for fear of a levy on it? A. No, sir. Q. Ever hear of it? A. No, I don't know as I did. Q. You mean to say you can't tell whether you heard of it or not? A. No, sir; I can't say whether I did or not. Q. There was a good deal of shuffling going on among Napoleon's property? A. I couldn't say. I wasn't there. Q. Don't remember of hearing of the circumstances? A. I might have heard of it, but never interested me. Q. A circumstance of that kind would be so ordinary it wouldn't impress itself upon you? A. No, sir; don't think it would; if I heard it I probably forgot it. Q. Where was the corn you saw Napoleon get from Claud there? A. North of Central. Q. What place? A. Williams's place. Q. When was it? A. 1903. Q. How much did he get? A. The biggest part of twenty acres, couldn't say the amount of bushels. Q. What was he feeding it to? A. Couldn't say. Q. What do you know about this corn being hauled to Napoleon's? A. I was there when Poly's hired hand hauled it. Q. How many loads? A. I couldn't say, there was several. Q. You were working for Claud at one time and went over and helped him work for his father? A. That wasn't corn gathering. Q. How long had you been working for Claud at that time? A. Well, he hired me, and we put up Poly's hay first, and then was to go to Claud's part, and it washed down and Claud paid me for the work. Q. You was exchanging work, wasn't Napoleon going to help him back with his hay? A. No, sir; it had washed down and he didn't want it. Q. Wasn't that the intention for them to exchange work, you and Claud help Napoleon and Napoleon and his hand help Claud.

You never heard of Claud having an account against his father until after this transaction came up? A. Yes, sir; I know of him buying this corn. Q. How much corn did he buy? A. I couldn't say. Q. How much was he paying for it? A. Thirty-five cents. Q. Where was you when the contract was made? A. Hauling corn for Claud to Lucerne.

Mr. N. B. Pickenpaugh, of lawful age, being produced, sworn and examined on the part of the defendants, testified as follows:

DIRECT EXAMINATION: Q. How long have you lived in this county? A. I couldn't tell you exactly— thirty years or more. Q. You got hurt on the Milwaukee Railroad? A. Yes, sir. Q. In 1901, I believe? A. Yes, sir. Q. Has that impaired your health? A. Yes, sir. Q. Where do you suffer? A. Well, I suffer in my hip, ankle, back and head. Q. Any injury to your spinal column? A. Yes, sir. Q. Have you been able to carry on your farm work and manage your business since that injury? A. No, sir. Q. Well, now, you may tell the court how you come to sell this one hundred and twenty acres of land in controversy to your son, Claud? A. Well, I owed the National Bank of Unionville here $250; a man by the name of John Bishop was my security and he got restless. Q. There was a judgment and execution levied on your land? A. Yes, sir. Q. That sale was set for a day in August, 1903? A. I think so. Q. How did you come to deed it to your son, Claud? A. Well, I sent my wife over to Young, he told me he wanted to buy the land and he said he had concluded not to buy it, and I was talking to my son, and he said if he could get the money he would take it; and I told him I believed he could get it from father, and I went to see father and he said if Claud wanted the land he would let him have the money, and help him to buy it. Q. That was why you sold it? A. Yes, sir. Q. Did your father let Claud have

the money? A. Yes, sir. Q. Who paid the money to the sheriff? A. Father. Q. Do you remember the amount? A. Well, I don't know whether I do exactly. or not, but I think it was $310.21. Q. Well, do you remember what encumbrance there was on the land, if any? A. There was $4,200 going to Hartford, Conn.; $300 to the widow Webb, and there was a commission to Bonfoey. Q. How much of that did your son assume? A. One-half. Q. How much land did that deed of trust cover? A. Two hundred and forty acres. Q. Your son agreed to pay half of it? A. Yes, sir. Q. Now, how did he pay the balance of it? A. He let me have two horses. Q. At how much? A. $100 each. And he let Mr. Alexander have a horse for $100, and I was owing Mr. Alexander, paid $100 for me, and he worked some in the harvest, and hired Mr. Bishop with a team helping. Q. Know what that amounted to? A. No, sir; I trusted to him to keep the account, I wasn't able to. I think $50 as near as I remember. And they put my hay up first, and the creek come up and run over his grass and made it worthless. Q. Didn't cut his hay? A. Don't think they cut but very little of it. Q. Was there any corn in the deal? A. Yes, sir; I had a man by the name of Jacobs hired and he hauled quite a number of loads and my son kept an account of them. I trusted to him to attend to that. It was cold weather and I wasn't able to be out to see after it. Q. Did you know the description of the land you sold him? A. Yes, sir. Q. What was it? A. Well, it was the north half of the northeast quarter of section 7, township 65, range 20, and there's a forty in eight, it joins it on the east. Q. Do you own the forty acres of land south of that? A. No, sir. Q. That's the one hundred and twenty you sold to your son? A. Yes, sir. Q. Did you see the deed when Squire Valentine wrote it? A. Yes, sir. Q. Did you read it? A. Yes, sir. Q. How did it read? A.

As near as I remember it read "the north half of the northeast quarter, section 7, township 65, range 20." Q. You know the controversy about that letter "N?" A. Well, I have heard about it since that time. Q. I will ask you now whether it was a letter "N" or "W?" A. I called it letter "N." Q. That's what you read it? A. Yes, sir. And I was hurt, and I just got him a tax receipt to get the numbers from and he also had an atlas. Q. What did you tell your son you wanted to sell it for? A. To keep it from selling.

CROSS-EXAMINATION: Q. You heard something last August about the recorder having misrecorded that letter, did you? A. Yes, sir. Q. Which farm was your son living on when he got this farm from you? A. He was living on what we called the Smith place. Q. That's what had been mentioned as the Williams place? A. Yes, sir. Q. What rent was he paying for it? A. Not any. Q. But when you got anything from him he charged you for it? A. Yes, sir. Q. You wasn't charging him any rent? A. No, sir. Q. And yet when you got a little corn from him he charged you? A. Yes, sir; he is my son. Q. How much land was that he was occupying? A. 122 acres. Q. What was it worth, rental value? A. It was my son and my land and I let him have the proceeds of it. Q. You got how much corn from him? A. Couldn't tell the number of bushels. Q. Raised on your land? A. He farmed and raised it. Q. And you charged him no rent? A. No, sir. Q. And the horses he got there while he was living with you? A. Yes, sir; he got three horses from home. Q. And these horses you got from him from time to time, did you get all of them at the same time? A. He got the three horses at the same time. Q. When was the work you spoke of done, what year? A. He always helped me harvest until the last two years. Q. Always charged you for it? A. Yes, sir; he was twenty-one years old. Q.

You never charged him anything you done for him? A. That was my business. Q. Now, give me the land that is conveyed in this deed from you to your son on the 28th day of August, 1903. A. Well, it was the north half of the northeast quarter of section 7, township 65, range 20, and then the other forty is in section 8. Q. Can you describe it? A. I don't believe I can. Q. When did you last see that deed? A. I haven't seen that deed from the time it was made until now. Q. You saw it to-day? A. Yes, sir. Q. Up to that time from the time it was made until to-day you never have seen it? A. I never have, no, sir. Q. When did you go up to Iowa to see your father with reference to the April term of court? A. Didn't go with reference to the April term of court. Q. Was you there in April, 1904? A. I was, the latter part. Q. What time? A. I think it was about the 26th or 27th. Q. You left here—do you remember the day of the week the 26th was? A. It was on Tuesday. Q. This case was to be tried of Harber & Knight's against you, was set for Monday. A. Yes, sir. Q. It was continued over from Monday until Tuesday because Magee couldn't get here on account of high water? A. I don't know as it was; it was passed over. Q. On Tuesday again you were here and insisting that both Magee and some lawyer you had in Iowa couldn't get here. A. No, sir. Q. On Tuesday you consulted with Judge Jones? A. Yes, sir; another man, Greenwood of Kirksville. Q. And it had been continued at the November term previous, at your instance? A. Yes, sir; it had been. Q. At your instance? A. Continued? I don't know, I wasn't here. Q. Wasn't here at the November term? A. No, sir. Q. You do know it was continued at the November term? A. Yes, sir. Q. You do know it was set for trial on the first day of the April term, 1904? A. I think it was. And you do know in 1904 you was representing to the court that

your lawyer, Magee, couldn't get here on account of high water? A. I suppose that was the reason. Q. And wasn't gentlemen called right in to show they had come from beyond the bridge you said Magee couldn't cross? A. They questioned some men here. Q. Then on Tuesday, and about noon you consulted Judge Jones and Mr. Greenwood? A. I consulted Greenwood earlier in the morning. Q. About noon Judge Jones—you consulted him? A. Yes, sir. Q. Where did you go that day? A. To Plano, Iowa. Q. What time? A. In the afternoon. Q. Where did you strike the train? A. I got on the Rock Island, went to Seymour and went from there to Jerome. Q. You didn't leave here until the afternoon? A. Yes, sir. Q. Where did you strike the Rock Island? A. Up here at—it was between Centerville and Seymour. Q. Bellnap? A. No, sir; I forget the name. Q. How did you get from here there? A. I started and walked out a little ways, and a man overtook me going north and I rode with him to the other side of Genoa. Q. The closest station of the Rock Island from this point is Seymour? A. No, sir. Q. The closest point from here on the Rock Island is Seymour? A. No, sir; it was on the Milwaukee and Rock Island also. Q. It is about twenty-two miles? A. I don't know, ain't that far, I don't think. Q. How far was it from here to the point where you took the Rock Island? A. I don't know exactly. Q. What time did you reach this point? A. Well, sir; it was after night, a little. Q. You took the night passenger? A. No, sir; it was just a freight. Q. Sometime after night? A. Just getting pretty dark. Q. And you went where that night? A. Got to Seymour and waited until a train came going to Jerome, and got to Jerome after night, don't know what time and then I walked to Plano. Q. What time did you get to Plano? A. Don't know, but it must have been 8 or 9. Q. You got on the Rock Island and went to Seymour? A. Yes, sir; and

then went to Jerome. Q. You got on the Rock Island east of Seymour? A. Yes, sir. Q. And went west to Seymour? A. Yes, sir. Q. What kind of a train did you strike on the Rock Island? A. Freight train. Q. Regular or extra? A. I didn't ask. Q. You got on a freight train on the Rock Island? A. Yes, sir. Q. Didn't get to the Rock Island until after dark? A. Getting pretty dark. Q. Did you take supper there? A. No, sir. Q. Then you came to Seymour? A. Yes, sir. Q. And got a freight at Seymour? A. Yes, sir. Q. How long did you wait in Seymour? A. Went from one depot to the other and along came a train and I boarded it. Q. That was a freight? A. Yes, sir. Q. Do you know whether either one of the regulars carried passengers? A. No, sir; they carried me. Q. Any other passengers on either of them? A. Yes, sir. Q. On the Rock Island? A. Yes, sir. Q. What day of the month was that? A. The day after I left town, I think the 26th. Q. Then after you got to Seymour, you went where? A. Jerome? Q. That's on the Milwaukee. A. Yes, sir. Q. How far from Seymour? A. It is next station, ain't it? Q. Then how far was Jerome from your father's? A. Three and a half miles, I think they call it. Q. You got out to your father's about what time? A. I didn't just look at the clock, I was most awful tired and hungry and my stepmother got my supper. Q. Was you father at home? A. Yes, sir. Q. What time was it? A. I don't know, might have been nine. Q. Somewhere between 9 and 12 o'clock? A. Yes, sir; somewhere along there. Q. Ever went that way before? A. No, sir. Q. Ever went that way since? A. No, sir. Q. You went from here starting to walk to strike the Rock Island? A. Yes, sir. Q. And got out how far? A. I expect a half mile north of town and some man overtook me. Q. Who was he? A. I don't know. Q. You rode? A. Up to Genoa. Q. That's where you took the Rock Island? A. No, sir. Q. How

far was it from the place you struck this man to Genoa? A. I don't know; the first time I ever went over that road. Q. Have you any impression at all? A. No, sir. Q. How far was it from Genoa to the place where you struck the Rock Island? A. I don't know. Q. How did you travel from Genoa to the Rock Island? A. I went afoot. Q. You don't know how far it is from this town to Genoa? A. No, sir; never went it only this one time. Q. You can't tell the court what point on the Rock Island that you struck the train? A. I would remember the town if I heard it. Q. It was very muddy? A. Yes, sir. Q. And the creek up everywhere? A. Not much on Tuesday, that was down; but the banks and bottoms awful muddy. Q. The trains up on the Rock Island at Centerville and Eldon and Des Moines had all been delayed on account of high water? A. I expect they was. But I got a train just the same. I know I come down on Monday from Centerville and seen places where the water washed the track out. Q. What time did your wife get in town that day? A. Early in the morning. Q. You tried to get the justice to take the acknowledgment of your wife to the deed before, over the telephone? A. No, sir. Q. You never visited your father in this way before in making this kind of a trip? A. What kind of a trip? Q. We have only been speaking of one; going from here to the Rock Island train and from the Rock Island to the Milwaukee and from the Milwaukee to this point and then walking out? A. That's the only time. Q. You left here that day knowing that this case was for trial? A. Yes, sir. Q. And knowing the plaintiffs had been insisting upon Monday as well as Tuesday of disposing of the case? A. I think you did insist on trying it Monday. Q. And you knew upon Tuesday it was being insisted that we would dispose of it. A. I think you fellows wanted it disposed of. Q. And you left sometime in the middle of the afternoon or later? A.

About the middle of the afternoon. Q. For your father's, having to go at least twenty miles before you could strike a railroad at all? A. I don't think it was twenty miles. Q. You know you struck the Rock Island east of Seymour? A. Ain't there a place by the name of Dunlap, ain't that the name, between Centerville and Seymour? Q. There's a Bellnap? A. I have forgotten the name. Q. What was your haste to get to your father at that time? A. I just wanted to go and I went. Q. Why was it necessary to make such haste? A. You fellows had demanded papers and I didn't intend to give them to you. Q. What papers? A. All my letters. Q. Was there any demand made for anything of that kind? A. Yes, sir. Q. And you went to keep from producing letters to be used, was that the purpose? A. That was my main purpose. Q. If you had any other purpose, what was it? A. That was my purpose. Q. After you learned the recorder had recorded, in recording that deed, had recorded the letter that you thought was "N" as "W," did your son speak to you about it? A. No, he didn't speak to me until after he had come to town and got the papers and had it fixed, and I think my wife told me. Q. What did you say about it? A. Well, I don't know just what I did say about it, I couldn't tell. Q. Did you express your satisfaction with it? A. Yes, sir; as near as I remember. Q. Don't remember exactly what you said? A. No, sir; but I was glad it was corrected.

Defendants introduced several witnesses who testified in their judgment that the land in controversy was worth not more than $25 per acre.

Judge Brawford, of lawful age, being produced, sworn and examined on the part of the plaintiff, testified as follows:

DIRECT EXAMINATION: Q. What is your business? A. Loan and real estate. Q. How long have you been engaged in that business? A. About twenty-

five years. Q. How long have you lived in this county? A. About fifty years. Q. Are you acquainted with the west half of the nothwest quarter of section 8, township 65, range 20; and also the north half of the northeast quarter of section 7, township 65, range 20, this county? A. Yes, sir. Q. Tell the court what that land was worth on the 29th day of August, 1903, and is worth now, in your judgment? A. From $30 to $35 an acre. Q. And is worth that now? A. Yes, sir. Q. You are acquainted with the land Pickenpaugh conveyed to his father about the 26th of April last? A. That was in section 7. Q. The land conveyed to his father on the 26th of April, what is that worth? A. I think about the same as the other; same kind of land.

Mr. Underwood, the recorder of deeds of Putnam county, testified in part as follows (having been shown the deed from N. B. Pickenpaugh to C. N. Pickenpaugh, his son):

Q. That contains the identical land as the deed before, the deed before it was recently changed; it is the same description as was recorded as being contained in the original deed?

Defendants object.

Objection sustained.

Q. What did you take that letter to be then, and now? A. Believed it to be a "W."

CROSS EXAMINATION: Q. You were not certain about that? A. Well, I was certain enough to tell them I couldn't record it as "N." Q. I believe you said yesterday it might have been read as an "N" as well as a "W," didn't you? A. I said it looked a good deal like an "N," but I believed it to be a "W." Q. You wouldn't be absolutely certain it was an "N," would you, it is not a very good letter of either? A. No, not very good. Q. You had some little doubt about it? A. Well, that was my judgment about it.

The findings and judgment of the trial court were for the defendants, and the plaintiffs duly appealed from that judgment to this court.

## OPINION.

I. The salient facts of this case are practically undisputed; and the differences existing between the parties do not question the existence of those facts, but go to the intention which underlies and gave them birth.

In the discussion of the legal propositions involved in the case, I will, first, make a brief statement of the facts; and, second, will call attention to the evidence preserved by the record which throws light upon the intention of the respondents underlying those facts.

On November 30, 1901, the respondent, N. B. Pickenpaugh, resided in Putnam county, this State, on a farm which he owned, consisting of four hundred and eighty acres. As far as disclosed by record, his family consisted of himself, wife and son, Claud A. Pickenpaugh, then about twenty-two years of age. The farm was worth $12,000. The assessment books of the county made in the year 1901 for the taxes of 1902 show that his live stock located upon the farm was assessed at the sum of $1,785; and that for the same year Claud Pickenpaugh's total assessment of all kinds of property was $130.

On the day first above mentioned, November 30, 1901, N. B. Pickenpaugh entered into a written contract with the firms of Harber & Knight and Childers Brothers, attorneys at law, to bring a suit for him against the Chicago, Milwaukee & St. Paul Railroad Company, for the purpose of recovering $20,000 damages for personal injuries, alleged to have been sustained by him through the negligence of the company. In pursuance of that contract they instituted a suit

in the circuit court of Sullivan county, on March 18, 1902. At the April term following, the railroad company 'filed its application and bond for a change of forum to the circuit court of the United States, sitting at Kansas City, which was granted by the Sullivan Circuit Court. The cause on reaching the Federal court was continued until the next term thereof, in order that Pickenpaugh might file cost bond; and at the succeeding term thereof the cause was again continued because Pickenpaugh's injuries rendered him unable to appear in court. The last continuance mentioned carried the case over to the April term, 1903, of the Federal court, and the cause was set for trial on May the 12th thereof. Because of those delays and continuances, as I gather it, and for certain other reasons not made perfectly clear by the record, Pickenpaugh grew restless and apprehensive of the results of that suit; and fearing that he and his surety on the cost bond might be required to pay large sums of money in the way of costs, entered into an agreement on or about May 1st with the railroad company to dismiss the suit. This agreement was made without the knowledge or consent of his attorneys, and in pursuance to that agreement the suit was dismissed when reached on the docket. In the meantime his attorneys had taken depositions and made other preparations for the trial of the cause, which do not appear fully in this record. Harber & Knight and Childers Brothers contended, without any evidence introduced in this case in support thereof (which I suppose would have been incompetent had it been offered, as the questions of attorneys' fees were fully and finally determined in the case of those parties against said Pickenpaugh, which will hereafter be mentioned), that Pickenpaugh had settled the case for a large sum of money. Pickenpaugh, however, without objection, testified that he dismissed the suit in the Federal court without receiving "one cent" in compensation of his injuries.

Upon learning of the agreement to dismiss the suit against the railroad company, said attorneys attempted to adjust, settle and collect the fees due them under the said contract of employment. Pickenpaugh refused to pay them any sum whatever, and definitely told them that if they could get anything off of him "they were welcome to it." After this interview they wrote him several letters demanding a settlement, and one of them, dated August 23, 1903, heretofore copied in the statement of the case, informed him that if he did not settle for their fees they would institute suit against him for the same at the following November term of the Putnam Circuit Court. Instead of replying to any of those letters, N. B. Pickenpaugh and wife, on August 28th, five days after the date of the letter before mentioned, by deed of general warranty, conveyed to their son, C. A. Pickenpaugh, the one hundred and twenty acres of land involved in this case. The consideration paid therefor, as stated in the deed, was $3,600.

The attorneys having been unable to make a settlement of their fees with N. B. Pickenpaugh, did, on October 22, 1903, institute suit against him therefor, returnable to the November term, 1903, of the Putnam Circuit Court. The defendant therein appeared and filed answer, and upon his application the cause was continued until the April term, 1904, of said court. The case was set for trial Monday, April 25th, but at the suggestion of defendant therein it was passed until the next day. On Tuesday, the 26th, a trial was had of the cause, and defendant, although present in court, took no part in the trial, which resulted in a judgment in favor of the plaintiffs in that case against him for the sum of $1,750. That judgment was not appealed from and still remains in full force and effect.

Some little time prior to the date on which N. B. Pickenpaugh conveyed the said one hundred and twenty acres to Claud Pickenpaugh, he also conveyed

another one hundred and twenty acres of his farm to a man by the name of Williams; and on the 26th day of April, 1904, the day on which the judgment for the $1,750 was rendered against him, he also conveyed to his father, Jacob W. Pickenpaugh, a resident of the State of Iowa, still another tract of one hundred and twenty acres of land for the consideration of $3,000, as expressed in that deed.

The assessor's books for the year 1903 showed N. B. Pickenpaugh's live stock was assessed at the sum of $2,359; and that Claud Pickenpaugh's total assessment of all kinds of property was valued at the sum of $145.

No part of the judgment against N. B. Pickenpaugh for said attorneys' fees having been paid, the plaintiffs in that case caused execution to be issued thereon on the 7th day of August, 1905, and placed in the hands of the sheriff of that county, who, on August 9th, levied it upon the lands involved in this litigation, and advertised them for sale on September 6, 1905. On said last-named date said lands were sold by the sheriff, and were purchased by Wm. H. Childers, the plaintiff and appellant in this cause. After seizure and sale of this land, the scrivener, at the instance and request of Claud Pickenpaugh, altered and changed the deed, dated August 28, 1903, from N. B. Pickenpaugh and wife, conveying this land to him.

Prior to May 22, 1903, N. B. Pickenpaugh had disposed of all of his live stock and other personal property which were subject to execution; and on that day an execution was issued on a judgment, dated April 10, 1903, in favor of the National Bank of Unionville against said N. B. Pickenpaugh, for the sum of $261.36, together with interest and costs, amounting to $310.11. The sheriff being unable to find any personal property subject to execution. first had one hundred

and twenty acres of the 480-acre farm appraised and set off to him as a homestead, and then levied upon the lands involved in this suit, and advertised them for sale, on August 27, 1903, but on the previous day, the 26th, said N. B. Pickenpaugh paid said execution in full; and the sheriff returned the same satisfied in full. In this connection it should be borne in mind that this land was advertised for sale the day before the date on which N. B. Pickenpaugh and wife conveyed the one hundred and twenty acres to their son, C. A. Pickenpaugh.

Both Jacob W. Pickenpaugh and Claud A. Pickenpaugh, the father and son of N. B. Pickenpaugh, knew of the indebtedness of the latter to his attorneys for their fees, and the former testified that he thought the indebtedness was unjust, and the son testified that he knew of the contract agreeing to pay the fees, but knew nothing about the suit which had been brought thereon.

Such additional facts as may be necessary for a proper understanding of the case will be stated in connection with the respective propositions to which they relate when we reach them for discussion.

From the foregoing recitation of the facts of this case it will be seen that between the time when N. B. Pickenpaugh conveyed the one hundred and twenty acres of land to Williams, which was about July or August, 1903, the exact month not appearing from the record, and the 26th day of April, 1904, the day upon which Harber & Knight and Childers Brothers recovered their judgment against him for $1,750 for their fees, he had disposed of all his property, both real and personal, which was subject to execution; and that there was nothing left of his $14,000 worth of land and live stock out of which that judgment could be satisfied.

Bearing in mind those undisputed facts, we will now take up and consider, separately, in their inverse

chronological order the various conveyances made by N. B. Pickenpaugh, disposing of his property; and in the light of the testimony bearing upon them try and correctly determine whether those conveyances were made in good faith in the ordinary course of business, or were made for the purpose of hindering and defrauding his creditors out of their just claims.

For convenience I prefer to consider each conveyance separately in the first instance, and also for the purpose of preventing confusion and a misunderstanding of the evidence in the case, and after so considering those questions we will briefly apply the conclusions reached thereon to the question of the good or bad faith of N. B. Pickenpaugh underlying the disposition of his property.

II.  We will first consider the disappearance of his live stock, and I use the word disappearance for the reason that this record is as silent as the tomb as to what became of the ninety-seven head of cattle and the twenty-odd head of horses which were on the farm, and which were assessed for the year 1903 at the sum of $2,359. That sum we know was far less than their actual value, for the reason that it is common knowledge that personal property is not assessed in excess of fifty or sixty per cent of its market value; and if we look at the same assessment books we will see that the personal property of Claud A. Pickenpaugh, one of the respondents, for the same year was assessed at the sum of $143, while his own testimony shows that three of his horses were worth $300, and that his father allowed him $200 for two of them in the trade for the land conveyed to him on August 28, 1903; and that Mr. Alexander paid him $100 for the third. But independent of these passing observations, the record totally fails to show what became of that stock. It is true Jacob W. Pickenpaugh, the father of N. B., said in one place in a casual statement, that

Drumm-Flato Commission Company held a mortgage on the cattle, but the record fails to show that he ever saw the mortgage; and he testified that he did not know the amount of money secured thereby, showing conclusively that he was testifying to hearsay testimony, which carries no weight or probative force whatever, whether objected to or not. In another place in his testimony Jacob W. Pickenpaugh said that "I think he," N. B., "paid the Drumm Commission Co. a part of it," meaning that he had paid to the former as part of the purchase price of the land he purchased from N. B., on April 26, 1904, on said mortgage; but upon further questioning he said he did not. know what sum N. B. paid on the mortgage. This, too, was clearly hearsay evidence, as clearly appears from the reading of the record. He did not pretend to be testifying from his own personal knowledge of the facts, but for the purpose of telling a plausible story which would receive favorable consideration at the hands of the court. Jacob A. Pickenpaugh was unable, or rather did not utter a word as to what disposition was made of said live stock, why it was sold, to whom, what it brought, or what became of the proceeds of the sale.

Upon this same point C. A. Pickenpaugh, the son and corespondent of N. B. Pickenpaugh, though living in the immediate vicinity of his father, was likewise unable to say what became of the cattle and horses. And if there was a person on earth who should have known what became of said live stock, N. B. Pickenpaugh was that person. He went upon the witness stand and attempted to tell at great length and in minute detail what his indebtedness was, even to the dollars and exact cents, his inability to pay the same, and the circumstances surrounding the various conveyances he made of his real estate; one tract to Jacob W., his father; another to C. A. Pickenpaugh, his son; and a third to one Williams, for the purpose,

as he says, to pay his honest debts; but not a word
did he say about the $3,000 or $4,000 worth of live
stock he had on hand just a few months before the
judgment of $1,750 was rendered against him, which
he strenuously insisted was unjust, and which he said
he did not intend to pay—that is, the claim upon which
that judgment was based was unjust, but he did not
contest it though present in the courtroom with his
able counsel on the day of the trial, and from which
judgment he neglected to appeal.  He could have told
the court in no uncertain words what disposition he
made of those cattle and horses, what sum of money
they sold for, and what he did with the proceeds of
that sale; but not a word did he utter upon those
most important questions.  If there had been an
honest sale made of the stock, then it would have
yielded him ample funds with which to have paid
all of his indebtedness when due, including the claim
of his attorney, and still there would have been sev-
eral hundred dollars remaining; while upon the other
hand, if he wanted to be dishonest and defraud his
creditors, he would have done just what the evidence
in this case suggests he did do, namely, secretly dis-
pose of the stock, place the proceeds of the sale pre-
sumably in his pocket, and decline to give out any
information regarding the disposition made of the
stock or what became of the proceeds of the sale.

Again, what did N. B. Pickenpaugh do with the
$600 cash his father paid him for the land he pur-
chased from him on the 26th day of April, the day
on which the judgment was rendered against him for
the attorneys' fees?  Upon the trial of this case he
acknowledged he received that sum in cash from his
father, and the record shows that he was practically
free from all debts with the exception of this judg-
ment after his property had passed through this
scheme of adjustment and settlement, portrayed in
this series of lawsuits.  If he was honest and wanted

to pay his honest debts, as he so earnestly endeavored
to convince the trial court, and which he seems to have
done, why did he not then and there pay or offer to
pay that $600 on the judgment his attorneys held
against him, instead of still opposing with all his power
their efforts to collect the same? That is what an
honest man would have done, and would have thereby
proven his good intentions by deeds and not by empty
words and sounding cymbals.

Not only this, what became of the purchase money
Williams paid him for the one hundred and twenty
acres he purchased of respondent, N. B. Pickenpaugh?
That must have amounted to something near $3,000,
for the reason that the evidence shows that all of the
four hundred and eighty acres was worth not less
than $25 per acre, which would make that one hundred
and twenty acres worth the sum of $3,000. This record
does not attempt to explain what became of that
money. If it had been honestly paid out or expended
that fact could have been easily shown to the satis-
faction of the court; but, no, not a word escapes his
lips in explanation of these important matters.

If I have not overlooked any of the items of N. B.
Pickenpaugh's indebtedness, the total amount thereof
did not exceed $5,600 when he started out to defeat
the payment of the fees due his attorneys. At that
same time this record shows that his real and per-
sonal property was worth not less than $14,000, and
that he had a good and prosperous business. And
it is a most significant fact in this case that none of
his creditors had ever pressed him for payment of
their claims before or after he disposed of his prop-
erty, not even down to this time, except the National
Bank of Unionville, and that claim was only for $310.
And that burdensome demand is the sole cause of all
of this trouble and litigation if we believe respond-
ent's story.

In view of those facts, the question naturally suggests itself to the mind, what became of all of that property? If we make a liberal allowance of $2,000 for his homestead and other exemptions, and add that sum to the total amount of his indebtedness, the total would be $7,600, which would leave unaccounted for property worth the sum of $6,400. We again repeat the question, what became of this money, or the property which the evidence shows N. B. Pickenpaugh had at the beginning of this trouble and which all of the testimony shows was worth that sum?

If there was no other evidence in this case than that which shows the existence of the facts stated in this and in paragraph one of this opinion, it would be sufficient in our judgment to warrant the court in finding that the respondent had conveyed his property with the intention to hinder and defraud his creditors; and we might with propriety add especially Harber & Knight and Childers Brothers.

III. We will next devote our attention to the conveyance of the one hundred and twenty acres of land made by N. B. Pickenpaugh to his father, Jacob W. Pickenpaugh, by the deed, dated April 26, 1904.

In the consideration of this proposition the facts must not be lost sight of that the grantee in that deed was the father of the grantor, N. B. Pickenpaugh; that he knew of the claim the attorneys had against his son for their fees for legal services rendered by them for him in the railroad case; that he knew the son was using every means at his command to defeat the payment of those fees; that he was assisting the son in the payment of what he considered his just debts by purchasing part of his property and paying him the cash therefor, and by furnishing his grandson, Claud A. Pickenpaugh, with the means with which to purchase other lands belonging to him; and that he, Jacob W. Pickenpaugh, at all times considered the

claim of the attorneys against his son to be an unjust demand.

Under that state of fact, without a word of explanation, we find that on March 18, 1904, about twenty days prior to the date of the rendition of the judgment against N. B. Pickenpaugh on the claim for the attorneys' fees, the following contract of sale of real estate was entered into between the father and the son, to-wit: "March 18th, 1904. This day N. B. Pickenpaugh has sold to J. W. Pickenpaugh the northwest quarter of section No. 7, township 65 and range 20, in Putnam county, Missouri, for $3,000; $2,400 on a loan on said land and $600 cash when deed is made." This contract was signed by both parties named therein.

There was no evidence offered to show why this contract was made at this inopportune time, or of the facts or circumstances which led up to or induced its execution, and Jacob testified that it was optional with N. B. whether he would consummate the sale or not. And when viewed in the light of the facts which existed at the time the deed was executed conveying the land to Jacob W. Pickenpaugh, that provision of the contract which stated that the $600 purchase money should be paid in cash becomes significant, which will be noted later on. N. B. Pickenpaugh at noon, on the 26th day of April, 1904, only a few hours before or after the judgment for $1,750 was rendered against him for the attorneys' fees, which he was trying in every way in his power to prevent paying, and which Jacob W. Pickenpaugh thought was unjust, started afoot to the home of his father, some forty miles distant, in the State of Iowa. Twenty miles of that distance he would have been compelled to have made on foot had he not by chance happened to have been overtaken by a wagon, on which he rode that twenty miles to a station on the railroad, the name of which is not given, and from there he rode on the train

to Jerome, three miles from Plano, the town where his father lived, and walked from the former to the latter place, and arrived there sometime between 9 and 12 o'clock at night of the same day. When asked why he did not wait and go by rail *via* the usual route, and why he went afoot and over that unusual route, he replied by stating, in substance, that he went because he wished to get out of the way so that Harber & Knight and Childers Brothers could not get his papers or letters to use in the trial of their case against him. That answer was clearly untrue, for the reason that he had been in court that very morning the case was set for trial, and was attempting to have it again set over or continued, but being unable to do so, he immediately left the courtroom and started afoot to the home of his father in Plano, Iowa. The answer was not only false, but it was clearly a makeshift for the purpose of deceiving the court as to his real motive; and that was, in my judgment, to deliver the deed, dated that same day, April 26, 1904, which had evidently been previously drawn to his father, conveying to him the one hundred and twenty acres of land involved in the other suit mentioned against him, hoping thereby to transfer the title to the land to his father before it could be seized under execution in satisfaction of said judgment, being ignorant evidently of the fact that the judgment when rendered would constitute a lien on the land, which would take precedence over the subsequently delivered deed; or he may have thought the trial might have been delayed or prolonged until he could reach his father and deliver the deed before the judgment could be entered. But, however that may be, N. B. Pickenpaugh appeared at the home of his father in Iowa on that same night, the 26th of April, 1904, and while there, and according to his testimony, without telling his father a word about why he went there at that particular time, or the route he took, or anything about the case pend-

ing against him, or the trial thereof, which, as before stated, took place that same day, delivered the deed to his father, and the latter assumed to pay $2,400 mortgage debt existing against it, and paid him in addition thereto the sum of $600 in cash, not by check, which would have been the usual and ordinary manner of transacting such business. This cash payment was provided for in the contract, and it is passingly strange, if the sale was made in good faith, that it was made on the very day the judgment was rendered against him, and upon the very heels of that unusual and most remarkable trip he made to his father's home. Not only that, but Jacob W. Pickenpaugh, his father, testified that he paid the son the cash for the land without knowing anything about what was the cause of N. B. going to Iowa, and that he did not remember of asking him anything about the trial of said case. That story seems a little strange to me, when almost in the same breath the father said that he would have been in attendance upon the Putnam Circuit Court to have assisted his son in the defense of the case had it not been for the pressure of business, yet he testified that he had no recollection whatever of ever making inquiry as to the case; but according to his story, before the ink of the record entry of the judgment against his son was dry, he with one hand, in good faith, accepted the deed which conveyed to him the last vestige of property of every kind which was subject to execution, or out of which that judgment could be satisfied, and with the other innocently paid to the son the purchase price thereof in cash, which also placed it beyond the reach of execution. Yet in the face of these fraudulent acts both Jacob W. Pickenpaugh and his son testified that said sale was made in order to enable the latter to pay his honest debts when no creditor was pressing except these attorneys, even the bank's little judgment had been paid long before this.

But the most remarkable part of the entire fabrication is, that neither of them intimated that any debt was paid with the proceeds of the sale after that most remarkable journey was made by N. B. Pickenpaugh to Iowa, which he says was for the purpose of avoiding the production of his letters or papers in the suit to recover the attorney's fees.

The simple and plain truth of the matter is this: Jacob W. Pickenpaugh and his son, N. B. Pickenpaugh, started out sometime prior to August 28, 1903, the day on which N. B. Pickenpaugh conveyed a hundred and twenty acres of his land to his son C. A. Pickenpaugh, to cheat and defraud Harber & Knight and Childers Brothers out of their fees, which were due them under their contract with said N. B. Pickenpaugh, dated October 30, 1901, whereby he employed them to institute and prosecute a suit against the railroad company to recover damages for personal injuries received by him; and from a careful reading of this record no impartial, fair-minded man can reach any other conclusion; and in my judgment the whole scheme was concocted and executed under the advice and instructions of Jacob W. Pickenpaugh, the father of N. B. Pickenpaugh.

IV.   The last question to be determined in the order suggested at the beginning of this opinion, and really the main proposition involved in this case, involves the validity of the deed, dated August 28, 1903, executed by N. B. Pickenpaugh and wife to Claud A. Pickenpaugh, their son, conveying to him the land involved in this suit.

Claud's version of that transaction is this: that when he became possessed of the knowledge that his father's land had been seized under execution on a judgment for the sum of $310, in favor of the Unionville National Bank against the latter, and which was advertised for sale on the 27th day of August, 1903,

he made arrangements with his father and grand-
father, Jacob W. Pickenpaugh, whereby he agreed to
purchase the land involved in this suit from his father
upon the following terms: He was to pay $3,000 there-
for, in the following manner, to-wit:   To assume a
mortgage indebtedness standing against the land for
the sum of $2,250, and his father allowed him the
following items upon the purchase price thereof, to-
wit: $56 due him for labor performed for his father;
$200 due him for two horses sold to his father; $100
for a horse which he sold to one Alexander, with the
understanding that Claud would look to his father
for the pay, in consideration of the fact that Alex-
ander had given N. B. Pickenpaugh credit for $100 on
a debt due him by the latter; $128 for corn sold to
his father; and the $310 due the Unionville National
Bank, which he says he paid for his father.   He also
testified that he authorized his father, N. B. Picken-
paugh, to make arrangements with his grandfather,
Jacob W. Pickenpaugh, to lend him the $310 with which
to pay the debt due the bank; that his grandfather
agreed to furnish the money provided Claud would
give him his note therefor, secured by a deed of trust
on the land he was purchasing; that in pursuance to
that agreement Jacob W. Pickenpaugh furnished him
the $310, and that he paid the same to the sheriff of
Putnam county in satisfaction of the execution held
by him, and had it returned fully satisfied; that in
pursuance to that agreement, on August 28, 1903, N. B.
Pickenpaugh and wife conveyed the land to him by
deed of that date; and that he made the note and
executed the deed of trust to his grandfather as
agreed.   Claud's father and grandfather substantially
corroborated his testimony regarding those transac-
tions.   I have not commented upon the fact that Claud
testified that he assumed to pay $2,250 of the $4,500
mortgage debts, when all the testimony in the case

shows Jacob W. Pickenpaugh assumed $2,400 of them
and paid $600 in cash for the land he got.

In our judgment we have shown conclusively in
the former paragraphs of this opinion that the re-
spondent, N. B. Pickenpaugh, had fraudulently dis-
posed of his property for the purpose of defeating and
preventing his creditors from collecting their debts;
and it, therefore, only remains to be ascertained and
determined whether or not the respondent, Claud A.
Pickenpaugh, knew of that fraud and was a party
thereto. The evidence which tends to connect Claud
with the fraud of his father is fully as strong and con-
vincing as was that showing the connection of his
grandfather with it.

In the first place his whole story is unreasonable.
He resided in the immediate neighborhood with his
father, and must have known that his father must have
had ample means with which to have paid off the
execution mentioned, which was for only $310, for
the reason that he had but recently disposed of some
two or three thousand dollars' worth of personal prop-
erty, and that there was no outward indications or
evidence that he had disposed of or had expended
any of the proceeds received for said property. Be-
yond that he would have this court believe that he,
only twenty-four years of age, with but four or five
hundred dollars' worth of property, at the most, de-
vised the scheme and undertook at his own instance
by which he was to purchase a farm of one hundred
and twenty acres, worth $3,000, in order to assist his
father, in good faith, to raise the sum of $310, with
which to pay off the bank execution. According to his
own statement the land was worth $3,000, and that he
paid that sum for it, while the deed shows he agreed
to pay $3,600 for it. He says that the reason why
he purchased the land was to save it from sale and
sacrifice under execution; and that he made the ar-
rangements for getting the money, which was neces-

sary to consummate the trade, from his grandfather through the efforts of his father, N. B. Pickenpaugh, and his corespondent. If that was his only purpose, then why did not Claud suggest and cause his grandfather to furnish the $310 direct to his son, N. B. Pickenpaugh, and take his note for the money, secured by a deed of trust on the land, instead of having N. B. arrange for getting the money for him from Jacob W. Pickenpaugh, and thereby obviate the necessity of conveying the land to him, Claud, and then he executing a deed of trust back to Jacob W. Pickenpaugh as security for the money, as was done? There was no necessity or reason for Claud's intervention in the matter if it was only his purpose to assist his father in raising the $310, for the reason that Jacob W. Pickenpaugh certainly would have assisted his son as willingly and as readily as he would have assisted Claud, his grandson. This is conclusively shown by the fact that Jacob W. Pickenpaugh was ever willing to assist N. B. in this matter whenever called upon to do so. In fact, almost a year later he purchased another one hundred and twenty acres from him and assumed an indebtedness of $2,400 standing against it, and paid him in addition thereto the sum of $600 in cash. So, under those facts, we must presume he would have furnished N. B. the $310, only one-half the sum he subsequently furnished him on request.

And independent of that, according to the testimony of all three of these parties, Jacob W., N. B. and Claud A. Pickenpaugh, the real estate owned by N. B. Pickenpaugh at the time his land was being advertised for sale under execution in favor of the bank was worth over and above all incumbrances three or four thousand dollars. One hundred and twenty acres of it was not mortgaged at all and it was worth $3,000, and the tract conveyed to Jacob W. Pickenpaugh was certainly worth $600 over and above the sum secured on it by the deed of trust, for he testified that he paid

that sum in cash for it over and above the mortgage; and the tract conveyed to Claud was presumably worth the $750 he says he paid for it over and above the incumbrance on it. But independent of their testimony, all the other evidence in the case shows that all of those lands were worth at least $25 per acre, which would make N. B.'s interest in the three tracts mentioned at the time they were advertised for sale and at the time he sold to Claud worth $4,300 over and above the incumbrances; and yet in the face of those facts he would have us believe that his father would have been compelled to have suffered two hundred and forty acres of his land to be sold under execution at a sacrifice because he was unable to raise the small sum of $310 with which to pay off the execution.

That story requires a man possessing a greater degree of credulity than I do in order to be believed.

Doubtless if N. B. had been acting in good faith, conceding he did not have the means in his pocket, he could have gotten the money from his father or from any other money-lender with that amount of good security to offer.

But that is not all of this story. Both Claud and his father testified that his father was in stringent circumstances and was unable to pay his debts, not able to raise even the $310, before mentioned, with which to satisfy the execution, under which about two hundred and forty acres of his land was about to be sold at a sacrifice, yet at the same time N. B. Pickenpaugh was permitting Claud to occupy one hundred and twenty acres of his land free of rent; and all of the testimony bearing upon that question shows that the land could have been rented anywhere from $210 to $240 a year; and Claud said he occupied and used the land free of rent for two years, which aggregate $420 or $480 for the two years, and that his father

gave him a house in addition, which he moved upon the land.

In law, equity and good conscience that money and house belonged to the creditors of N. B. Pickenpaugh, and if insolvent, as he claims, he had no legal right to give that money and house to Claud, for the reason that a man must be just before he can legally be generous. If he was not insolvent, as contended by counsel for appellant, then his property had been either concealed or disposed of for the purpose of defrauding his creditors.

If the former statement is true, then the gift of the rents and house to Claud was a fraud in law upon the appellant and his other creditors; and if the latter contention is true, then the donation of the rents to Claud was void because it was a fraudulent disposition of his property. [Fehlig v. Busch, 165 Mo. 144, and cases cited.]

But independent of that fact, whichever horn of that dilemma we may take, the same evidence which shows its existence also cuts deeper and proves beyond cavil that the land conveyed by N. B. Pickenpaugh on August 28, 1903, to Claud was also a fraudulent conveyance of his property and that it should be set. aside for the benefit of his creditors. According to the testimony of both Claud and that of his father, the former took the crops and live stock raised on the land, which are the representatives of the rents given to him by his father, and paid for the land in suit with those crops and stock, which, as before shown, did not belong to him, either in law or equity.

So by this little scheme of apparent innocent generosity of the father to the son, it was in fact a fraudulent scheme by which Claud has had not only the use of this land free of rent from August 28, 1903, to this time, which is worth not less than $1,500, but he has also become the owner of the land and the house thereon if the deed from N. B. Pickenpaugh to him is per-

mitted to stand, which land he testified was worth $750 over and above the mortgage standing against it; the two items, the rents and the value of the land, aggregate at this time about $2,250, which is far in excess of the amount of the judgment held by Harber & Knight and Childers Brothers against N. B. Pickenpaugh.

There is another view which must be taken of the deed from N. B. Pickenpaugh to Claud which vitiates it, and that is the confessed alteration of the deed. That act shows that it was made and executed in fraud of creditors, and that Claud knew of and participated in the fraud.

The undisputed facts are that a short time after the deed was executed, which was on August 28, 1903, Claud filed it in the recorder's office of Putnam county for record; and that Mr. Underwood, the recorder of deeds, in copying the deed wrote the description of the land in the record as follows: "lying, being and situate in the county of Putnam and State of Missouri, to-wit: Forty acres N. W. of the N. W. section eight (8) township sixty-five (65), of range twenty (20), and eighty acres W. ½ of N. E. quarter of section seven (7), township sixty-five (65) of range twenty (20)." That shortly after the rendition of the judgment in the circuit court of that county against N. B. Pickenpaugh for the sum of $1,750, which was on April 26, 1904, in favor of Harber & Knight and Childers Brothers, they caused an execution to be issued on said judgment and placed in the hands of the sheriff; that the sheriff seized and levied the execution upon the following described lands, situate in that county, to-wit: the north half of the northeast quarter of section seven, township sixty-five of range twenty, and other lands not material to the question now under discussion. On or about August 16, 1903, after the

levy of the execution, Claud A. Pickenpaugh without the knowledge or consent of the makers of the deed had it altered and changed in the following particulars: the following letters and words: "W. ½ of N. E. quarter of section seven," contained in the deed when recorded were so erased, altered and changed as to read as follows: "North ½ of N. E. quarter of section seven," and was on that day recorded in that changed condition.

In other words, the letter "W" just before the figures "½" was erased and in the place thereof the word "north" was written, thereby purporting to convey a different tract of land than the one which the deed purported to convey when first recorded.

N. B. Pickenpaugh and his son, Claud, testified that it was the intention of the former to convey to the latter the north half and not the west half of the northeast quarter of section seven, and that they so informed Mr. Valentine, the scrivener who drew the deed. Mr. Valentine testified that he was instructed to draw the deed so as to convey the north and not the west half, and that in writing the description of that land he wrote the letter "N" and not the letter "W," and that the recorder of deeds mistook the letter "N" for the letter "W" and therefore recorded the deed incorrectly in that regard. He also testified that after the north half of the northeast quarter of said section had been levied upon, Claud took the deed back to him and informed him as to the manner in which it had been recorded. He also testified that he then examined the deed and found that the letter which the recorder had taken for a "W" was in fact the letter "N," and that at the request of Claud he erased the letter and wrote in its stead the word "north," and thereby made the deed read the "North ½ of the N. E. quarter of section seven," instead of the "W ½ of the N. E. quarter" of said section, as it appears of record. Claud's testimony was substantially the same

as Mr. Valentine's was upon that point. Upon the
other hand, Mr. Underwood, the recorder of deeds, who
recorded the instrument, testified that he examined
the deed closely, and that in his judgment the letter
was a W and not an N as claimed by Claud and Val-
entine, and, consequently, in recording the deed he
copied the letter as a W.

The question now presented for determination
is, which of those two stories is true—the one told
by Valentine and Claud upon the one hand, or that
told by Underwood upon the other?

Mr. Underwood was a public officer with no inter-
est whatever in the matter to influence or knowingly
induce him to record the letter "N," contained in a
deed as the letter "W." So, if he had not testified at
all in the case, the law would presume that the deed
was correctly recorded, for the reason the law pre-
sumes an officer properly performs his duty.

But that is not all of the testimony upon that
question. Mr. Underwood was called as a witness in
the case, and he testified that in his judgment the let-
ter was a "W," and for that reason he recorded it as
such. If the weight of that evidence has not been over-
come by the respondents, then we must hold that the
deed never conveyed the north half of the northeast
quarter of said section seven, whatever may have been
the intention of N. B. Pickenpaugh. The testimony of
Claud Pickenpaugh and that of Mr. Valentine is re-
lied upon to overbalance the evidence for appellants
upon this point. We will discuss their testimony
separately.

In weighing Claud's testimony we must not over-
look the relationship that exists between him and N.
B., and Jacob W. Pickenpaugh, his father and grand-
father, for the reason that they have greater interest
depending upon the result of this litigation than he
has. His own personal interest in the case must also
be considered, as well as his whole testimony in the

case, and his conduct and connections with the fraudulent transactions heretofore pointed out. According to his testimony, his interest involved in this suit is worth about $1,000, and his fraudulent conduct hereinbefore pointed out is not a very high certificate of commendation to this court. In testifying regarding the change in the deed Claud said he "presumed the letter erased was an N and that he thought it was;" and the mere fact he had the deed changed shows that he thought the letter was a W, and that he thought other people would so consider it, and for that reason he wanted to destroy all ocular evidence of the fact that there had been a mistake made in drafting the deed, and that fact could be best done by erasing the letter, which the recorder says was a "W," and thereby throw doubt in the mind of the court as to what the letter really was, and then rely entirely upon parol testimony to overcome the testimony and the official act of Mr. Underwood, the recorder.

His conduct also shows a fraudulent design on the part of himself and father from the time this deed was executed to cover up and conceal the latter's property from his creditors, for the reason that he had the change made without the knowledge or consent of his father. He knew the deed was conceived in sin and delivered in fraud, and when he discovered the mistake and realized that one forty of his father's land had not been disposed of, and by that mistake it had been left exposed to seizure and sale by his father's creditors, he hastens to the scrivener who drew the deed, without the knowledge or consent of his father, and had him change it, believing that was the only way the judgment lien could be cut out, and thereby give his deed a preference over the lien; knowing all the while that such act would be in furtherance of that design and that his father would approve his conduct, without question, just as he did when informed of the change, he had the deed altered in furtherance thereof.

When we view Claud's testimony in the light of those facts, and consider his interest in the case and his relations to the other parties to this litigation, we are not loath in saying that it is wholly unworthy of credence.

As to the testimony of Mr. Valentine, we have but little to say. He seems to be a man of some intelligence and judgment. From his title and official connection with this litigation, we judge he is a justice of the peace, and must be somewhat familiar with the ordinary forms of conveyancing and rules of evidence, and should have known the legal effect of a change made in a deed in the absence of the maker, and especially after the validity of the deed had been called in question by legal proceedings, as was the fact in this instance. Good judgment and fair dealing between man and man should have suggested to him the impropriety of his making erasures in the deed, but notwithstanding those facts, when Claud brought the deed to him and told him what the recorder of deeds had done, according to Claud's version, the following occurred:

"Q. Is that what you and your father told Valentine to write in the deed? A. Yes, sir; and he told me when I took the deed to him the letter was an 'N.' Q. Did you see and read the deed? A. Yes, sir. Q. What was the letter? A. I presume it was an 'N.' That's what I thought it was; and he said positively it was; said it was as plain as the nose on a man's face."

Now, if the letter erased was as plain as the nose on a man's face, what was the object of Mr. Valentine's erasing it and writing in its place the word "North?" That is a very suspicious fact to be considered in weighing his testimony, especially after the title of forty acres of land hinged upon the fact whether the letter was an "N" or a "W." If he was honest in his conviction that the letter was an "N"

and not a "W," but thought there might be doubt in the minds of other persons as to what the letter really was, then it seems to me common sense and common honesty would have suggested to him a new deed, giving the correct description of the land and reciting therein the fact that it was made for the purpose of making certain that which was doubtful in the deed in question; or if he did not care to go to the trouble of making a new deed but wanted to be fair in the premises, why did he not first obtain the consent of the maker of the deed and then simply draw a red line through the letter and then write the word "North" above the line and indicate its proper place by a caret. By following either of the plans suggested the doubt could have been made certain without destroying the existence of the very thing that was in question, and thereby place it beyond the power of the court or any one else to view and determine with ocular certainty what the letter in fact was, but by erasing the letter he compelled the court to depend entirely upon parol testimony in determining that fact.

The deed itself, of course, in its present condition is no evidence whatever tending to prove that the letter was in fact an "N" and not a "W," but upon the contrary the alteration of the deed should be considered as a badge of fraud, and before any court would be justified in finding that an officer had erroneously recorded a deed which had been changed after its recordation, and especially after litigation had arisen regarding the very matter which is involved in the alleged error, the evidence should be clear, convincing and overwhelming, leaving no room for a reasonable doubt as to the existence of the error. And we have no hesitancy in saying that the evidence in this case falls far short of that standard and weight.

With great pains we have carefully read this long record, fully weighed the evidence, and after duly considering all of the legal propositions involved, we are

clearly of the opinion that respondent N. B. Pickenpaugh disposed of his property for the purpose of defrauding his creditors, and especially Harber & Knight and Childers Brothers; and that his father and son, Jacob W. Pickenpaugh and Claud A. Pickenpaugh, knew of and were parties to his fraudulent purpose and accepted the deeds mentioned in the record from him to them for the purpose of assisting him in carrying out the fraudulent designs.

We are, therefore, of the opinion that the findings and judgment of the trial court were for the wrong parties, and that the judgment should be reversed and the cause remanded with directions to the trial court to set aside its findings and judgment in favor of respondents and enter a judgment for appellant, setting aside and cancelling the deed, dated August 28, 1903, signed by N. B. Pickenpaugh and wife, conveying the land involved in this case to Claud A. Pickenpaugh, and to make such other orders, judgment and decrees as may be just and proper in the premises; and to proceed according to due course of law and try the case upon the second count of the petition.

It is so ordered.

All concur.

